## J. J. HILLIARD et al. *v.* JAMES CAGLE et al.

46   309
685   253
85   259

1. DEED OF TRUST GOOD ON ITS FACE MAY BE SHOWN BY EVIDENCE ALIUNDE TO BE FRAUDULENT. — A deed of trust, valid on its face, and not made or received with any intent to defeat existing or future creditors, may, nevertheless, be held to be fraudulent and void as to all creditors, existing and future, by evidence, *aliunde*, showing the conduct of the parties in their dealings in reference to the deed.

2. SAME — FRAUD — RETENTION OF POSSESSION. — Retention of possession by the mortgagor or grantor in a deed of trust is not *per se* fraudulent, but in order that the possession may be innocent the deed must be recorded or notice of it brought home to the party, before he has dealings with the mortgagor or grantor.

3. INDULGENCE AFTER DEFAULT. — Indulgence to the mortgagor, or grantor in the deed in trust, remaining in possession after default, may or may not be fraudulent as to other creditors, according to the special circumstances.

4. MORTGAGE — FUTURE ADVANCES. — It is legitimate to give a mortgage for a sum certain named in the deed, when that sum is intended to cover future advances, and in such case the security is valid as to third parties to the amount so named.

5. DEED — FRAUDULENT AS TO SUBSEQUENT CREDITORS, WHEN? — Subsequent creditors must show that a deed, complained of by them as fraudulent, was made with intent to defraud them.

6. SAME — CASE UNDER REVIEW. — Where a merchant largely indebted to his commission merchants, on the 19th December, 1866, executed a deed in trust conveying all his property, real and personal, for the security of his said creditors, as to past and future indebtedness, under the provisions of which he was to continue in possession and business as before, receiving advances from his factors and sending them cotton, and in order to prevent injury to the credit of the grantor in the deed of trust, by an understanding between the parties, it was withheld from record until late in January, 1867: *Held*, upon a review of the facts, that the deed was fraudulent and void as to subsequent creditors, the same as if it had been so contrived and intended.

7. PRESUMPTION. — A party must be conclusively presumed to have intended fraud, if fraud logically results from his conduct.

APPEAL from chancery court of Lincoln county. PEYTON, Chancellor.

This was a bill by sundry judgment creditors of W. P. Baggett to vacate and cancel a deed of trust he had executed to secure Summers & Brannin. The particulars of the execution of the deed of trust are fully stated in the opinion of the court.

The complainants, severally, had taken out attachments against Baggett, and all had been levied on the land, and some on the personal property embraced in the deed of trust, and they had, severally, obtained judgments on their demands against Baggett, and united in this bill to cancel the deed of trust, and render their judgments effectual against the property contained in it.

*W. & J. R. Yerger,* for appellants.

This is an appeal from a final decree of the chancery court of Lincoln county, declaring void a deed of trust executed by W. P. Baggett to secure Summers & Brannin creditors of his, and enjoining a sale under the deed of trust by Hilliard, the trustee.

The construction of this deed of trust was before this court in the case of Summers & Brannin et al. v. A. Roos & Co., 42 Miss. 749.

The present suit is a proceeding in chancery by James Cagle and others, judgment creditors of W. P. Baggett, praying that the deed, because fraudulent, should be canceled, and the trustee, who it seems was about to sell under the same, enjoined from the same, etc.

The record is exceedingly bulky and is full of evidence that has certainly no bearing upon the case in its present aspect. As to whether as a matter of fact Summers & Brannin, at the time of the transfer of the goods in the store-house, did or did not undertake to pay off the debt of Cagle and others, as stated by some of the witnesses in the cause, is a matter entirely foreign to this suit. The question here is

simply, whether or not this deed is void because of fraud as to the creditors of Baggett.

Upon this subject we have only the deposition of E. H. Summers and Larkin, the partner of W. P. Baggett. The deposition of W. P. Baggett is not taken. We cite the court to the evidence of Summers for careful perusal. It establishes the fact that the deed of trust was fairly executed and received, and without the slightest intention of hindering and delaying or defrauding creditors.

The testimony of Larkin is brief, and he says that it was not given to hinder, delay or defraud creditors. We do not think that it can be seriously pressed upon this court that this deed of trust was void as to subsequent creditors of Baggett or those creditors whose debts were created after January 30, 1867, when the deed of trust was recorded. But we think it will perhaps be argued, that the debts of the creditors of Baggett, residing near his home, to wit : Cagle, Gartman and Bennett, were created prior to the time when the deed of trust was recorded, and that it should be declared void as to them, and subsequent creditors, let in, etc. In reply to this, even if this deed of trust, because not recorded before the creation of the debt of Cagle, Gartman and Bennett, is void as to them, the other creditors who gave credit after the deed of trust was recorded, will not and ought not to be let in. The deed will only be declared void as to those debts, and not to the debts created subsequent to the date when the mortgage was recorded, and on that point we cite the court to the opinion of the court in the case above referred to in 32 Miss. 749 ; Rev. Code, art. 3, p. 359, etc.

The testimony shows, we think, that an actual sale was made by Cagle, Gartman and Bennett, prior to the recording of the mortgage, although, perhaps, there was no actual delivery of the cotton until a while after, but whether that was or was not so, does not, in our judgment, affect the case. These parties did not have judgments and liens upon the property ; they were mere unsecured creditors of Baggett. For them to

have the deed of trust declared void, it is necessary to show a fraudulent intent. Nothing of this sort is shown ; the deed was executed in good faith and for a lawful purpose. It was withheld from record for a while because Baggett was deemed solvent, with no intent to defraud creditors, but to enable Baggett to more readily make his collections of debts due to him in January, 1867.

It was perfectly competent for W. P. Baggett, after the debts to Cagle, Gartman and Bennett, to have given a preference and given this very property in trust to secure the debt to Summers and Brannin, unless it was done with the view and especial intention of defrauding those creditors. This matter of preferring creditors is analogous to the doctrine of conveyance by a husband with reference to the effect upon the dower of the wife. If the conveyance is made with the intent to deprive the wife of dower, it is bad ; but, if made in good faith, etc., it is a good conveyance. And so too, with reference to creditors in the conveyance made by debtors. Here was Baggett with considerable property, Summers & Brannin trusted him as a man of honor and a prosperous merchant, so admit did Cagle and others. He gave a preference to Summers and Brannin ; it was a fair preference, not made to defraud others, but made to secure them, and this was permissible by the laws of Mississippi.

The result of the business matters of Baggett is one of every day occurrence ; Summers & Brannin dealt with him heavily ; they, as prudent men, exacted security. Cagle and others were his neighbors ; they dealt with him, trusting to him personally and for small amounts ; the crash came. The security which Summers & Brannin took will, if upheld, save to them a little part of their very large debt, and is but the proper reward of their prudence and vigilance as merchants. The term "creditors" in the statute, concerning the recording of conveyances, means creditors having a lien, not creditors at large. Tate v. Leggatt, 2 Leigh, 99.

Where a loss must ensue to one of two parties it should be made to fall on the negligent and indulgent. Summers & Brannin actively contributed to the condition of things which held out. See Lear v. Friedlander & Gersor, 45 Miss. 559.

The record shows that most of the testimony in this case was delivered in open court under the eye of the chancellor. His decision predicated on the testimony will not be reversed in such a case without it is manifestly and clearly wrong. See Keaton v. Miller, 38 Miss. 630.

*J. B. Chrisman*, for appellees.

This proceeding was instituted by the judgment creditors of W. P. Baggett, to cancel a deed of trust, made by him to J. B. Hilliard for the use of Summers & Brannin, and made, as they allege, to hinder, delay and defraud his creditors. The complainants commenced by attachment against Baggett, and levied on a part of the property conveyed. Some of the complainants levied on a portion of the personalty mentioned and described in the deed of trust, and all of them levied on the real estate. The trustee interposed his claim for the beneficiaries in each case where the personalty was attached and those suits are still pending and undetermined. Judgment, however, was rendered against Baggett and the land attached was condemned to be sold under concurrent liens, for largely over and above the value of every thing attached. The land, therefore, being insufficient in value to pay the judgments of complainants, and the title being in dispute, they have united in this bill for the purpose of having the deed of trust declared void, and for removing the cloud, doubt or suspicion which it casts upon the title, that the property may bring its full value at a public sale under their executions.

There are three classes of creditors; two claims, to wit: Sheldon & Hoyts and W. A. Ransom & Co. were creditors before the deed of trust was executed. These constitute the first class. Gartman, Cagle and Bennett were creditors of

W. P. Baggett for a large amount between the time the deed was executed and the time it was placed upon the record; they are the second class. The other complainants are creditors subsequent to the record of the deed of trust, and constitute the third class. Such relief as they seek is by no means new to the profession, and is perfectly legitimate. Fowler v. McCartney, 27 Miss. 516 ; Vasser v. Henderson, 40 ib. 519.

The testimony in the case shows that in 1866, Baggett was carrying on a large mercantile business in the town of Brookhaven, and that he engaged largely in buying cotton. This cotton was all shipped to his commission merchants, Summers & Brannin, in New Orleans, the beneficiaries in the deed in controversy, who, in the usual way, advanced him, from time to time, money and supplies. During the season of 1866, cotton steadily declined, and, under the advice of his commission merchants, Baggett withheld it from the market. He became largely indebted in consequence, and his debts began to embarrass him. He found on the 19th of December, 1866, that a sale of three hundred bales of cotton, then held by his commission merchants, would not pay them, and he had other debts in New York, New Orleans and Mississippi, rapidly maturing, and which threatened to overwhelm him.

At this juncture in his affairs, Baggett held a consultation with his merchants, who urged him to make them a deed in trust of all his property, except the cotton which they then held, to wit: the three hundred bales. To this Baggett objected at first, but somehow his scruples and objections were overcome, and a note for $40,000 is alleged to have been made due ninety days after date, and a deed in trust was executed on all Baggett's property to a clerk in the house of Summers & Brannin, to secure the payment of the note.

The deed of trust treats this note as an existing debt, and recites that in consideration of one dollar, "and the debt hereinafter intended to be secured," the conveyance in trust

was made, and to be void, if "well and truly paid at maturity." And further it recites, that, "in case of default in payment of said note," etc., the property conveyed to the trustee should be sold. The grantor, by the terms of the deed, retains possession "until he shall make default in the payment of said note;" he is, however, to ship certain cotton conveyed in the deed, amounting to one hundred and ten bales, which is to be sold and placed to his credit on the note of Summers & Brannin.

The cotton conveyed is shown to have been worth about $14,000, the land, lots and personalty on the plantation, about $20,000. The stock of goods conveyed, about $25,000. The personalty on the plantation is described as "ten head horses and mules and a lot of hogs and sheep now on the plantation." The $25,000 worth of goods conveyed are designated as "the stock of goods, wares and merchandise now in said storehouse in Brookhaven." There is no other or further description of this personalty. Its character or value or condition is not otherwise described, and the value attached is from estimates by persons who have testified. From the same source we learn that there was to be no interruption or change in Baggett's business, or the manner of conducting it. His business was to proceed after as before the execution of the deed, and it was at the same time agreed that the knowledge of the trust deed should be withheld from the public.

The transaction took place in the city of New Orleans, on the 19th of December, 1866. In it, Baggett included every thing he owned, except the cotton in the hands of his commission merchants, and a small tract of eighty acres of land near Wesson, of inconsiderable value, which he took for a bad debt, and which seems to have been overlooked.

At the same time this deed was executed, there was another agreement entered into which materially varied the terms of the deed of trust, which was not made part of it, and not intended for record in any event.

By the terms of this private agreement, it appears that

there was an unsettled account between the parties, and they contemplated a continuance of business with each other ; and it being uncertain what the balance would be when struck in ninety days, the object of the deed and note was to secure the said balance, whatever that might be. Summers & Brannin agreed to take up certain acceptances falling due in a few days, and to advance $70 per bale on all cotton forwarded, all of which was to go to the debit of Baggett. It recites that there was a balance of about $1,000 due on the Bennett and Gartman cotton, the Bennett cotton being designated as the Strickland cotton, and, unless paid by Baggett, was to be paid by Summers & Brannin on its reception.

Baggett thereupon returned to the state of Mississippi, and kept this agreement profoundly secret. Not even his book-keeper, who was his son, was advised of it. His neighbors and creditors are shown to have been taken by surprise when the secret became known in March, 1867.

He exerted his credit in the mean time in buying cotton and borrowing money. Gartman and Bennett's cotton was not delivered or paid for when mortgaged to Summers & Brannin, but had been contracted for and was delivered to Baggett on or about the 23d of January, 1867, after the execution of the deed, 19th December, 1866. Cagle's cotton was obtained at the same time, but he agreed to sell on credit, and took Baggett's note as for loaned money, and seems to treat the transaction throughout as a loan of money. On the 30th of January the deed in trust was placed on the record. Accompanying the deed to the clerk, was a private letter from Mr. Summers, who requested the clerk to record it privately, and say nothing about it, lest it should operate to the injury of Baggett's credit.

Business proceeded as if nothing had occurred. There was no provision made to account for the goods mortgaged. Baggett used them in his family, paid debts with them, sold them in detail and in bulk, bought $25,000 worth more, mixed them indiscriminately with the goods on the shelves,

all of which was known to Summers and Brannin, who were in constant correspondence, and visiting the house in person and by their agents from the execution of the deed to its maturity.

Baggett, during the first forty-five days after the deed was executed, shipped his house over four hundred bales cotton, and paid them in money and drafts about $16,000. A few days after the deed was recorded, he purchased of his New Orleans creditors over $10,000 worth of goods, which were brought to his store in Brookhaven. On the 22d of February, he writes to his merchants that he despairs of "coming out on cotton;" and says that Roberson "has heard of the deed of trust." Baggett and Summers hold further conferences at Brookhaven. They fear attachments and negotiate for a surrender of the goods before forfeiture of condition in the deed. Baggett demands, as a condition precedent, that the second class of creditors mentioned shall be first paid, threatening to pay them with goods in the store, over which he has full control. They came to an understanding by which Summers assumes the $3,000; there was a hasty and formal delivery of the goods before the deed of trust matured, and Summers then refused to pay the $3,000, on the ground that Baggett had refused to induce Mendenhall to hand him over accounts for the benefit of his house, amounting to over $8,000.

The news that Baggett had surrendered to Summers & Brannin took everybody by surprise, except the immediate actors in this scene, and the creditors one after the other attached. All attached his real estate. Some attached the goods. The New Orleans creditors finding, on examination of the deed, that it was executed to secure an existing indebtedness to Summers & Brannin, and that property in Mississippi was covered by the mortgage, sufficient or nearly sufficient to pay the debt, and that he had not conveyed some seven hundred bales of cotton, which the books at the depot showed had been

shipped, assumed that that mortgage novated their account, and that the factor's lien was extinguished.

Accordingly they attached Baggett in New Orleans, and garnisheed Summers & Brannin. Their defense was, that the note and deed was not credited on the general account, that it was not intended as a payment, but to cover an ultimate balance which might grow out of their dealings, and exist at the end of the ninety days. Thus the factor's lien was held to cover the cotton in Louisiana, by virtue of the secret agreement executed contemporaneous with the deed and the deed itself relied on to hold the property in Mississippi.

About the date of the surrender of the goods to Hilliard, Gartman, who, with the creditors of his class, were the last to attach, was quieted by Summers with the assurance that his debt had been provided for by the terms of surrender between himself and Baggett. I omitted to mention, at the proper place, that immediately after the record of the deed, Baggett transferred his notes and accounts, amounting to about $16,000, to one Thomas Mendenhall.

I believe I have now fairly stated the leading facts of the case, such facts as are incorporated in and nowhere contradicted by the record. There are many other significant facts clearly established, and others about which the parties are in dispute, but these will be referred to in the argument.

The Roos case decided : 1st. That a deed for future advances need not specify that fact distinctly on its face, provided the deed to secure future advances gave all the requisite information as to the extent and certainty of the contract. 2d. That this deed came within that rule ; gave all the requisite information. 3d. If the deed was made *bona fide* at the outset, no subsequent fraudulent or illegal acts of the parties would invalidate it. 4th. That this deed is a good deed on its face ; that to have it declared void, it must be impeached for fraud by extrinsic evidence. 5th. That the question arising out of the circumstances under which this deed is executed is one of fraud or no fraud

against the defendants, and a question of fact for the jury and not for the court. 42 Miss. 784. 6th. That what the jury might have found on that fact, the court cannot know they were precluded from determining the question because of the instructions of the court. 42 ib. 787. 7th. A deed or mortgage, though fraudulent as to prior, is not so as to subsequent, creditors. These are the points decided by the Roos case, and all that it does decide. Admitting the first, second and third points to be correctly decided, the court has not estopped but invited to an inquiry on the fourth, fifth and seventh points. Notwithstanding the deed is good for future advances, good on its face, extrinsic facts may show that it was fraudulent, and if it can be shown that it was designed to cheat from its inception, then on the authority of the Roos case, and the case of Bullitt, Miller & Co. v. Taylor & Richardson, 31 Miss., it must be declared void. To illustrate, let us suppose that Baggett, the grantor, and Summers & Brannin, the beneficiaries, entered into this agreement honestly and in good faith, with no other purpose at the time than to secure the payment of an honest debt, but that, after the execution of the contract, the parties mutually agree that the deed shall be withheld from record, and kept profoundly secret until Baggett can borrow a large amount of money and buy a large amount of personal property, and that, upon his hasty accomplishment of this fraud on unsuspecting creditors, the deed may and should then be recorded, so as to defeat liens by attachment or otherwise. Will not such subsequent fraudulent and illegal acts invalidate the security? Would a court of equity countenance such a transaction, and enforce the decree against the defrauded creditors? And yet, the language of the Roos case, on the point referred to, is unqualified. As an abstract proposition, the first point announced in the Roos case is true; but with the light which this record sheds on the subsequent agreement of the parties, which agreement is the one now sought to be enforced by virtue of this deed, how can it be said that it

gave all the requisite information as to the extent and certainty of the contract? It gave no information, but was false from beginning to end. It provided that it was to be credited with shipments of cotton, whereas it was not to be credited. It provided for the surrender of $25,000 worth of goods in Baggett's hands to secure the debt, whereas the agreement was, that he was to trade and traffic with the goods, continue his business, and had unlimited power of disposal over them. They recorded a sham, and now seek to enforce an agreement under and by virtue of it, which speaks a different language.

The deed of trust was executed to be recorded, otherwise the pocket agreement would have been incorporated in it, otherwise there would have .been no false recitals, otherwise it would not have been acknowledged before a notary. It would have been good between the parties and binding without such acknowledgment, but it could not have been recorded without, or operated as notice without it. At what stage of the proceeding then, or in what event was it to be recorded? It was recorded when Baggett's credit and money failed. Was that a mere coincidence? There was a distinct agreement to conceal the transaction, nevertheless. No witness can be found, who will testify that he ever heard of it before it was filed for record. No one was intended to know it then but the clerk. It has operated as a swindle, and to know the motive becomes important.

Shall we take Mr. Summers' elucidation, and, if so, which one? In his answer he puts it mildly that they feared its effect upon Baggett's debtors. In his deposition, he says: Baggett used the word "business." They feared its effect on Baggett's business. But in his letter to Cowart, the clerk, before any inquiry was instituted into this transaction, it was Baggett's credit that was likely to be injured. Injured with whom? With W. A. Ransom & Co., whose goods he had already? No! but with A. Roos & Co., E. Loeb & Co., L. H. Sterne & Co., and Myer, Weiss &

Deitch. Here is the motive and original purpose, and Gartman, Cagle and Bennett are witnesses of the success of the scheme, up to that stage !

Did Summers know that Baggett was buying goods on credit? See testimony of Henry Block about his interview with Summers, which took place in November, a few weeks previous to the execution of this deed. Block says Summers told him how Baggett was buying goods, " That he was buying bills through the month and on the first of the month giving drafts on Summers & Brannin." What a nice transaction that was with Block ? Block was induced to sell the goods on credit, and in less than two weeks Summers & Brannin had a mortgage on them.

But let us admit that this too was a mere coincidence, it establishes the fact that Summers knew what he said, and said what he meant when he wrote to Cowart.

Now, if this agreement was made with a view to the present result, it was fraudulent from the beginning. The seventh point in the Roos case decides that, and so does Bullitt, Miller & Co. v. Taylor & Richardson, 31 Miss.

Was it so intended ? The fact, that so much pains has been taken from the outset to keep the real transaction from the public, is a suspicious circumstance. Here is a transaction which is covered up by a triple contrivance to conceal it. First, the recorded deed gives but a feeble idea of the real contract; next, they agree to keep even that concealed ; and, finally, when Summers finds it necessary to record it, for the purpose of using it as constructive notice, he induces the clerk to defeat the very object for which notice is given. Why put it on the record if he did not want any one to know it ? If he has thus defeated the complainants in this case of notice, shall he now be heard to say that they had notice by the record. There is a good deal of uneasiness exhibited by the defendants at this feature of their case. See how the answer iterates and reiterates that they were afraid it would frighten Baggett's debtors ? Baggett's customers were such a rascally set,

that, if they saw him in trouble, they would desert him. Can it be that they never thought once that it might have the same effect on A. Roos & Co., and on his other creditors ?

There is another pregnant fact in this connection. The goods mortgaged are not described, but it was the goods in the storehouse that were deeded, and all that remained and could be found there, were, by the terms of the trust, to be surrendered in ninety days.

It was certainly very much to the interest of Summers & Brannin that that store-house should be well filled; there can be no dispute about that. It was very much to their interest that he should buy Gartman and Bennett's cotton on credit and borrow Cagle's money, if he could thus secure it all to the credit of Baggett, then in failing circumstances. He has got the goods, the money and the cotton as a result of this concealment. Here is another wonderful coincidence ! But it is said for defendants that they advanced the money to pay for the Bennett and Gartman cotton. That is demonstrably untrue. They agreed to advance $70 per bale for all the cotton forwarded to them. Four hundred and five bales were forwarded. Baggett was therefore entitled to receive $28,350, but they do not pretend to have advanced but $26,000, and they admit the reception of $10,000 in cash, and Baggett has shown that they received in fact and in truth about $16,000. In the face of a fact so palpable, the assertion that this money was forwarded to pay for this cotton is the most unblushing effrontery exhibited in the case. No, they got the cotton, the merchandise and the money, and they got it by this contrivance, whether intended or not.

The answer offered to this aspect of the case is very plausible. It is said that the effect would have been precisely the same if Baggett had executed the deed on the day it was recorded, because, as the statute makes the deed a lien only from the date of its record, and Baggett had the same right to execute the deed on the 30th of January, the date

of its record, that he had on the 19th of December, it has injured no one by having been executed in December and withheld, instead of being executed in January and recorded. Now this is the very strongest manner of putting this case for the defendants.   The answer to this is : first, if Baggett entered into this scheme on his part with a full knowledge of its practical operation, he intended by it to make an experiment to save himself from failure by large purchases of cotton, which he was in hope would rise in value, an experiment which he knew to be hazardous ; and he took such steps as placed him under the shelter and protection of a single creditor, believing that that creditor would deal favorably with him, on account of such an exercise of partiality, if a crash came.   He knew, in such a case, and Summers knew, that the success of Baggett was the success of his factors.   He not only paid them his debt, but they would make large commissions on his business.   True, they advanced him $70 per bale, but that was little over half its value, and their factor's lien secured them.   If he failed, he not only secured them with all he had, but must necessarily largely reduce their debt, and in such event they would divide the property, or, as the fraudulent scheme is called in the Twine case, "deal favorably with him."

In the event cotton advanced, the transaction need never see the light ; if it went down, they were ready ; the trap was set, and the triggers had only to be touched, and the cotton, the money and the goods were safely housed under its friendly shelter.   Baggett's credit being the basis of this scheme, the recording of the deed would have defeated it; and the experiment being hazardous, they must be ready for any emergency.   Such a design as this upon the public ought not to be upheld.   On the contrary, if the true theory of this case is, as I believe it to be, that the scheme was concocted by this commission house in secret, and that Baggett, as well as his creditors, walked into it without a just conception of its true character, then the making of the deed on the nineteenth December was a right which

Baggett never would have exercised on the thirtieth January, after the failure overtook him and the friends who staked their all upon his integrity were unpaid and unprovided for. And this was just the event Mr. Summers foresaw, and for which he was prepared with his unrecorded deed; he was ready for the hour of success or despair.

Mr. Summers says that this promise not to record was given after execution of the deed. His memory must be at fault. Every reasonable presumption is, that the question was maturely considered and fixed before the signing of the instrument. Without that agreement it is incomplete and purposeless. Baggett had some object in making this deed. To have made it and put it on record would have paralyzed him at once. The parties looked to the future. It was not an ordinary case in which a man makes a deed in trust to secure a debt, and works it out or proposes to work it out with means under his control; or a case in which he receives an equivalent for his mortgage. But it is a case where the grantor and grantee looked to the success of an experiment based on the credit of the former, and in which the grantor at the same time surrendered all his property and gets nothing. In such a case it is a fraud to withhold the deed, if it is ever meant to be recorded. What did Baggett get for this deed, on $50,000 worth of property? $8,000 advances and $70 per bale on cotton that was worth double the money. He looked to the success of a desperate experiment, and Summers knew it. In such event it was a fraud on those creditors to agree to conceal. A double fraud, where the purchase and proceeds went into the lap of Summers & Brannin.

The account is left open by the pocket contract, and catches all cotton going down with the factor's lien. The deed of trust catches all goods coming up in the store. Thus all fish passing are caught. This up and down stream trap catches Gartman, Cagle and Bennett's cotton going down, and Roos and Loeb and Myer, Weis and Deitch coming up. Assaulted in New Orleans, Summers defends with

the pocket contract.    Attached in Mississippi, Hilliard
"limbers up" the deed of trust.

Whatever may be said to defeat the prior and subsequent
creditors of Baggett, it seems to me, no honest man can
believe that Summers & Brannin ought not to pay Cagle,
Gartman and Bennett.    It is no better than heathen honesty
to pay them.    He took a mortgage on their cotton when it
was unpaid for by Baggett, and undelivered, and he knew
it.    He agreed to pay for the balance due on it, and he has
violated that promise as a simple  calculation in multiplica-
tion demonstrates.    He again agreed to pay it, in order to
get possession of Roos and Marx, and other creditors' goods
before they attached.    And he kept Gartman from attach-
ing until he is now among the last and will probably get
very little.

And having got possession of the goods under a promise
to pay these men, he holds possession and collects the rent
of the store-house in which they were, under and in pursu-
ance of that contract, and now refuses to pay, refuses because
he says Baggett agreed to give him $8,000 to pay $3,000.
This pretense is on a par with the pretense that the money
was sent to Baggett to pay for the cotton, and certainly
deceives no one.    That Summers agreed to pay this money
for the surrender of the goods and the house, he stands con-
victed by the testimony and by the circumstances.    Mr.
Summers is contradicted in this respect by all the witnesses,
and is not sustained by his own witness, Hilliard, who
heard the conversation on the subject.

The court in the Roos case treated this transfer to Sum-
mers as a sale, and intimated very strongly that the plain-
tiffs in execution had failed to prove that it was the prop-
erty of Baggett, as they were bound to prove before they
could recover.    This is well known to be Mr. Hilliard's
strongest card.    How can Summers repudiate that contract?
According to his testimony in this case he had no right to
make that defense in the Roos case.    So that, if the court
is of opinion that this deed should be upheld against Shel-

don and Hoyt, and W. A. Ransom & Co., creditors of the first class, and the New Orleans creditors who are such, subsequent to the record of the deed, it will nevertheless hold that it cannot be upheld against the equity of Gartman, Cagle and Bennett, and that, unless in a reasonable time the money is paid to them by Summers & Brannin, the deed in trust shall be canceled and the property sold, or that the trustee, out of the proceeds, shall first pay them their debt, damages and costs.

The testimony shows that the mortgage on the goods was not taken with a view to subject them to the payment of the debt, but to enable Baggett to dispose of them in the regular course of trade. There is nothing on the face of the deed to show this, but the private agreement shows it, and the testimony clearly establishes it.

I presume the court is satisfied from the testimony of the parties that no restraint was intended to be put on Baggett in their use or disposal. It is charged in the bill and not denied. It was asserted by Larkin, and Summers, who testified afterward, does not deny it. It is shown that he was cognizant of the fact, while Baggett was disposing of them, and the extent of his complaint or objection, so far as it is disclosed by his own testimony, is, that Baggett was selling at wholesale.

Now suppose this feature of the agreement had been distinctly incorporated in the deed. It certainly would have been pronounced fraudulent in law, because the deed of mortgage or trust would then have been inconsistent with itself. See Somerville v. Horton, 4 Yerger, 541, and Charlton v. Day, 5 Humph. 496 ; Farmers' Bank v. Douglas et al., 11 Smedes & Marsh.

A mortgage *ex vi termini*, imports that the property mortgaged shall stand good for the debt on default of payment. To the public these parties so declare. They say this $25,000 worth of goods shall be sold at public vendue, by a disinterested party, and the proceeds shall reduce this debt. Other creditors are thus advised that they may be

present and make the property bring its value.   But by the terms of the private agreement Baggett himself is to sell the goods at his convenience upon his terms and at his own price. The trustee in this transaction is a man of straw.   I say such a transaction is condemned by the force of legal rules without reference to the actual design of the parties.   It is necessarily inoperative.   The parties make it so by a con-trolling, concurrent agreement.

This not only illustrates the character of the deed, but it absolutely vitiates and destroys its legal effect as a whole. It cannot be good in part and bad in part.   They cannot be indulged in such a game as that would be.   Where the con-tract is vicious it is void, and this general rule is not impugned by the cases which allow deeds to be good as to property properly described, and ineffectual as to that which is uncertain and imperfectly described.   If fraud-ulent in an essential part it is void *in toto*.   See Handy v. Pack & Clifton, 4 Smedes & Marsh. 257 ; Burke v. Murphy, 27 Miss. 186.   That a deed which is inconsistent with the object for which it purports to be executed is void, has been the settled law since the enactment of the statute of 13 Elizabeth ; what constitutes the proof of that fact is the only open question.   The subject is fully treated in Dar-ence v. Handly, 3 Yerger, 402 ; 4 ib. 541 ; Robins v. Parker, 3 Metc. 117 ; Richmond v. Curdap, Meigs, 581 ; ib. 533.

Let us admit for the sake of the argument, that on the authority of Hildreth v. Sands, 2 Johns. 35, and on the authority of Hungerfed v. Earle, 2 Vern. 261, this deed must be so declared as to the subsequent creditors of Bag-gett.   These cases decide that a deed not at first fraudulent may afterward become so by being concealed, or not pur-sued by means of which creditors have been drawn in to lend their money.   This is a stronger case than either of those referred to, because here there was an agreement to conceal, by the beneficiary who was well acquainted with the fact, that the business of the mortgagor involved the exer-cise of his credit, and that he was in failing circumstances.

*Harris & Withers,* on same side.

Regarding the opinion of the chancellor as entirely sound on all the main propositions contained in it, we adopt it with the authorities cited by him, as the presentation of the grounds on which the deed of trust, the subject of controversy, should be held void.

These propositions are : 1st. That though the deed may not contain provisions which, of themselves, render it void as fraudulent in law ; yet, those provisions, coupled with the conduct of the parties under it, which may be looked to as properly developing the intent with which it was made, make a case of fraud in fact, or a contrivance which, in its bearing on the rights of creditors, is condemned by sound legal policy. 2d. That though there was a valid consideration for the deed at the date of its execution, and though Baggett had the right to make the deed and the usees, Summers & Brannin, the right to accept it, yet the secret agreement to keep it from the public, followed by actual concealment in withholding it from registry, and during this interval of concealment allowing Baggett to appear before the world as the owner of unincumbered property and to deal with that property as owner, whereby persons were induced to trust him, renders it fraudulent and inoperative as to those who dealt with him without actual notice of the deed.   3d. That the conduct of parties, under a deed ostensibly valid and fair, may be resorted to as evidence of the real design of its execution ; and the unrestricted use of the property conveyed by the grantor for his own benefit and in his business, with the full approbation of the grantee, coupled with a secret understanding that the knowledge of the deed shall be kept from the public, in order that the actual condition of the grantor's affairs may be concealed, establishes a case of fraud without regard to any other motives which may have mingled in the transaction.   4th. That the reason given by Summers for concealment, to wit, that it was to advance Baggett's interest in the matter of collecting his debts, whether true or false, does

not exempt the transaction from legal condemnation, as from Summers' knowledge of Baggett's affairs, he must be presumed to have anticipated that parties would be misled by Baggett's apparent freedom from embarrassment, and that, by giving that publicity to the deed which the policy of the law requires, he would put other creditors on the alert and disincline persons to trust him. The known tendency of his concealment being to mislead others to their prejudice, it matters not that he may have had some other motives in the concealment. 5th. That the combination between Baggett and the house of Summers & Brannin was one by which Baggett was to enjoy for his and their exclusive benefit, a fictitious credit to the enlargement of his business and their profits, the direct tendency of which was to mislead persons to trust the latter, and was, therefore, in fraud of subsequent creditors

These propositions are incontrovertible. The actual scheme, which is disclosed by the supplemental agreement, was to prevent Baggett from going to protest on certain debts then about to mature, a result regarded by both as fatal to his business. That business was more profitable to Summers & Brannin than to Baggett. Its continuance, in the belief of the parties, as is manifest in the very character of their proceedings, depended on the concealment of Baggett's actual condition from the public. The provision for meeting his most pressing liabilities was, of itself, a measure of concealment, and to make public the fact that he was in December, 1866, not only unable to meet debts amounting to $12,009, but that he was otherwise so deeply involved that a mortgage of his entire, tangible property was necessary to prop him up, would not only prevent persons from selling him cotton on credit, but would have set in motion all his other creditors. Hence part of the scheme was to put Summers & Brannin in a position by which, on the first symptom of failure or rather exposure, they having Baggett's deed, covering all his property, might outstrip all creditors and acquire a prior lien by recording the deed,

and in the meanwhile to keep the public in the dark as to Baggett's actual condition, giving him the appearance of prosperity in order that they might get the "$5,000 balance from Brookhaven." Accordingly they agree that the deed shall not be put on record. It matters not whether Baggett proposed this concealment and Summers assented, or that Summers proposed and Baggett assented, it was agreed on. It is of no avail that the smooth-tongued Summers says that he thought Baggett's condition so sound that the deed was a mere form to gratify his partners. These partners, aware of Baggett's condition, did not consider him safe. Nor does it matter that Summers yielded to Baggett's request for secrecy for the reason stated, to wit, that his debtors would regard his condition as so critical, and his credit so affected by the publicity of his actual condition, that he could assist them. There is involved in this very reason an acknowledgment that the recording of the deed would prevent people from trusting Baggett. Summers knew Baggett to be commercially insolvent. Baggett had besought his assistance because he had come to a dead halt, that he was perfectly aware of the effect of recording the deed, and saw that the effect of publicity would be to injure Baggett's credit by showing that his situation was critical. He was conscious of possessing knowledge of Baggett's affairs which no other man had. He knew that, by recording his deed, he cut out those who had trusted Baggett, while he might have thought the chances favorable to Baggett's tiding over the crisis; both he and Baggett were conscious that it was not improbable that he might fail, and they both made up their minds that the effects of that failure should fall on those who, ignorant of the true condition of his affairs, sold him their property. It is no excuse that these men are prepared to say that it was not their wish to injure any one, it is enough that they were fully conscious that a risk impended; fully aware that the public was ignorant of it, and that they deliberately provided for themselves and deceived the public; subjected innocent and

ignorant men to positive loss by their selfish conduct. It is bad faith by every test. On this branch of the subject I refer the court to the case of Gill v. Griffith, 2 Maryland Chancery Decisions, 270, a case which is adopted by Mr. Hilliard, without qualification or dissent. 1 Hill. Mort. 473. It is a case so closely resembling this, that it is decisive if the decision has any weight or authority.

What was the character of this deed of transfer? According to Mr. Summers it was deemed of no importance. He knew it did not take effect as to third parties without registry, and it was never to see the light except in a contingency, and that was Baggett's failure and the consequent necessity for using it to prevent other creditors from reaching the property conveyed. Here was then a deed in form and a deed delivered, but one which was inoperative as to third parties, and ineffectual for the only purpose for which such a deed is given, that is, to secure priority of lien. If Baggett could tide over the critical period, then it was to be waste paper; was this a transfer of title? A deed may be good to take effect on a contingency, as in the case of an *escrow*, but not on such a contingency as here contemplated. Was it designed to transfer the property? The conduct of the parties shows that they did not consider it as having that effect, for, from the beginning, there was no change of ownership; in fact, Baggett was allowed to consume the goods, to sell and dispose of them as his own. The goods then in store were conveyed ostensibly as a security for a debt, and yet, in point of fact, they were clearly not so intended, because Baggett, the next day, with Summers' knowledge, commenced to use them for his own purposes and did actually consume them. While possession may be consistent with the terms of the deed, the appropriation of the property by the grantor is inconsistent with the idea of transfer of ownership, because it is plainly subversive of the declared object of this deed. This conduct shows that as between the parties themselves, the deed was a sham, not a transfer of title in fact. Such a deed, therefore, cannot be

regarded by the courts as effecting a divestiture of Baggett's title, because plainly it did not, and plainly was not designed to interfere with any right of ownership in Baggett. In another aspect of the case, how does the secret understanding, not disclosed in the deed but made manifest by the conduct of the parties under the deed, stand with the policy of the law. It was an agreement by which Baggett derived the benefit of the entire stock of $25,000 ; that he did realize this benefit is perfectly clear, for, at the end of ninety days, notwithstanding an addition of $20,000 more, there remained but $11,000. If bare possession, contrary to the terms and legal operations of the deed, is *prima facie* fraudulent as evincing a colorable conveyance, what shall we say of the agreement that he shall not only possess but that he shall absolutely own the property conveyed, to consume or sell it as he sees fit, without accountability. I acknowledge the rule that subsequent acts of fraudulent dealing may not affect the validity of a deed in all respects fair and *bona fide*, but the conduct of both parties in giving effect to the deed is the most pregnant evidence to establish an original, illegal design inconsistent with the professed objects of the deed.

Here then we have a conveyance by a man in embarrassed circumstances, not wishing to put those who might thereafter deal with him on their guard, conveying secretly all his tangible property to a friendly creditor. That creditor, being deeply interested in continuing the delusion under which those labored who were not behind the scenes, concurs in this policy of concealment, the probable, the inevitable effect of which was to mislead others. We have, moreover, these parties in order the more effectually to blind the public, concurring in the exhibition of the grantor as the actual owner of property conveyed, allowing unlimited power of disposition as any owner ever possessed, and we have the natural fruit of this scheme in the practical misleading of innocent men, and the fact that Baggett got, with consent of Summers, the benefit of the property conveyed.

How this court, as the highest tribunal in the state, the guardians of the laws and of public morality, can, in view of the spirit of these laws and of the necessity of enforcing good faith and fair dealing, indorse this transaction, I am at a loss to see.   Much has been said and much will be said of the liberal conduct of Summers.   The support which a commission house gives to a large business house in the country is based on a strict business calculation.   Look into the account here, and it will be apparent that the items of commissions on advancing sales, etc., had much to do with his so-called generosity.   The advances of $70 per bale on cotton delivered to them in New Orleans, was no great favor, as the cotton was the most ample indemnity, and when we look at the huge balance of $114,000, we must remember that there were three hundred and sixty-three bales of cotton on hand, worth thirty cents per pound, and that this reached seven hundred bales before the ninety days ran out.   The business which he proposed to foster was exceedingly rich in profits, and he did not wish it to be interfered with by the rumors to be set afloat by the malicious or by the meddling of timid creditors.   He decked Baggett out in the seducing garb of a man of large possessions and sound credit, in order that he might the more effectually lead men to deal with him, and having got all the cotton he could by this means, he then quietly put the deed on record to cut off those whose cotton Baggett had purchased.

The creditors, prior to the recording of the deed, are to be regarded as creditors prior to the time the deed was made operative, for we cannot regard the deed as a complete assignment as to creditors until it was adopted by Summers and treated by him as a transfer of the property.   This rule was applied in the Maryland case.   The deed, however, being tainted with the design to overreach subsequent creditors, is fraudulent as to all creditors, and the recording of it could not give it validity.   Gartman and Bennett say they would not have trusted Baggett but for the deceptive appearance of solvency, and we find Summers withholding all

knowledge of the deed from parties who were dealing with Baggett in New Orleans, actually encouraging them to sell to him.

Much reliance is placed on the decision in Roos v. Hilliard, involving part of the property conveyed, but it should be recollected that the precise points considered in that were the instructions to the jury, as to future advances and as to the burden of proof, the court, in that case, expressed some views as to the possession of the property by the grantor after conveyance.    The case was actually disposed of on the two questions above referred to.    It was not necessary, and, indeed, would have been wrong, to decide that the conveyance was valid on the evidence, because a jury must decide the question of fraudulent intent.    Indeed, that decision cannot be safely adopted as to many things the court seemed inclined to sanction.

A deed of trust may be valid although the grantor is suffered to remain in possession, but, where he is allowed to possess and use the property as his own, that is evidence of a fraudulent design, and strong evidence at that, especially if there be nothing in the deed requiring him to account. These facts can only mean one thing, and that is, that it is for the benefit of the grantor.    So, deeds of trust may be valid if made to cover future acquisitions, yet such deed must, on its face, show this to be the intention, and such acquisition must, when made, become the property of the grantee, and not subject to the disposition and control of the grantor.

A man may make a valid deed of trust for future advances, but the deed must disclose that fact in terms, or it must be given for a named sum actually intended to cover such advances.

Now, it is apparent that in respect to the matter, possession and the power of disposition without accountability, and the matter of future acquisitions without specification and a power of disposition, the deed in question is obnoxious to the objection suggested, and when we couple with these facts

the secret agreement not to record and the secret instruc-
tions to the recording clerk, not to let it be known, and that
it was recorded; we have the strongest evidence of a fraudu-
lent design, and to this is to be added the other pregnant
fact, that the deed covered every thing.   Baggett had
"pigs and poultry," showing an intention to keep him
completely shielded in case of failure.   The chancellor
fairly concluded that these things evinced a fraudulent
design as to all creditors prior and subsequent; and when a
judge is required to decide questions of fact, his conclu-
sions are like those of a jury, not to be overturned, because we
might come to a different conclusion on the same facts, but
only when these conclusions are manifestly unsupported by
evidence, such is the doctrine of this court, announced in
the Yazoo case, Steele case, and quite strongly in chancery
causes; and, manifestly, it cannot be said in this case, that
the conclusion is unsupported by evidence, and the case of
Roos v. Hilliard is not in opposition to his conclusion, that
turned on propositions of law only.   The fact that Bag-
gett, Sr., was not introduced as a witness by Summers &
Brannin, is not without significance.   Indeed, it cannot be
explained, except on the ground that they believed he would
contradict their answer.   That answer is not sustained by
a single witness.   It is contradicted by all the witnesses.

Larkin contradicts it flatly in his narrative of the grounds
on which the goods were transferred, and his statement of
the negotiation which preceded the transfer.   Either Mend-
enhall or Summers has sworn falsely in reference to the
condition upon which the transfer of the notes and accounts
was to be made.   The testimony of Gartman and Summers
is in conflict in relation to the agreement of Mr. Summers to
pay him.

It is apparent that Hilliard contradicts Summers in the
matter of the secret conferences had by the parties, in
apprehension of attaching creditors.   Hilliard had his
"surmises."   Surmises about what?   Why, clearly that

they were arranging to defeat the attachment of complainants.

The answer being thus shown to be false, what weight shall we attach to his testimony? The court will not fail to observe that most of this testimony was delivered in open court. The chancellor had an opportunity to observe the bearing of these witnesses in the delivery of their testimony. He took the case under advisement, and his written opinion shows that it was predicated upon a careful and laborious consideration of the facts. Why should we not attach the same importance to it that is attached to the decision of a jury in like circumstances? Why should the court substitute any other view, if there is sufficient testimony on which to rest his decree? We submit that the question now is reduced to this: Was the decree of the chancellor clearly wrong? We have now had two decisions on the facts in this record, the verdict in the case of Goos & Co. *v.* Hilliard, 43 Miss., and the decision of the chancellor in this case.

SIMRALL, J.:

W. P. Baggett was a large merchant and cotton dealer, doing business at Brookhaven, having intimate relations with Summers & Brannin, cotton factors at New Orleans. The latter, according to the course of the dealings, advanced money and credit to Baggett to keep up his stock of merchandise, and to supply funds with which in part to buy cotton to be shipped to and sold by them. In December, 1866, a large cash balance was due to Summers & Brannin, subject, however, to credit by the proceeds of cotton then in hand, but not sold. In view of a continuation of the business on the same scale, and to provide for the ultimate security of these factors, it was insisted upon by them and acceded to by Baggett that he should execute to them a deed in trust covering his plantation and stock thereon, his storehouse in Brookhaven, and his merchandise. Accordingly on the 19th of December, 1866, Baggett made his note for $40,000, payable at the Canal Bank, New Orleans, ninety

days after date, and the trust deed to secure it. At the same time a contemporaneous written agreement was made explanatory of the transaction, and, in addition thereto, to the effect that the note was given to represent the indebtedness then due, and the balance, as it might be, at its maturity. The business, however, to continue as heretofore by the purchase and sale of merchandise, buying cotton to be sent to these factors in New Orleans, and sold for account of Baggett. Baggett, at this time (and so did Summers through whom the negotiations and business was conducted), believed that he was entirely solvent. But he insisted that the deed in trust should not be recorded (in Lawrence county) until the last of January, assigning as a reason (as stated by Summers) that it would injure his collections, according to another witness because it would injure his credit. Whichever be the correct report of his " reason " it is manifest that he wanted the deed withheld from registration, because, if recorded, it might impede and embarrass his business. It would seem that all or nearly all the means realized by Baggett from the sale of goods, as well as money supplied by his factors, were placed in cotton. The course of the market was downward, and it is inferable that the insolvency which overtook him, within less than sixty days after making this note and deed is referable to the decline in the value of cotton, curtailing a loss upon the cotton purchased, and diminishing his collections from those to whom he had credited out his goods.

The testimony does not convince us that the arrangement was made, with a fraudulent scheme and purpose, to defeat existing or future creditors. This was not the primary motive. Summers & Brannin desired that Baggett should continue his business as before, but at the same time they were anxious that they should be protected at all events, and in any contingency. If misfortune and calamity should fall upon him, their purpose was to be secure.

It was not designed that the execution of the deed should in any wise interfere with and change Baggett's business.

He was to sell and replenish his stock of merchandise as before, and buy all the cotton that he could control. If it became necessary to make the deed available, by a sale under it, it would apply to and embrace the goods in the storehouse at Brookhaven, at the time the trustee took possession. The interval between the date of the note and its maturity embraced the best business season of the year, the period for collections, cotton sales and active business in merchandise.

In ascertaining the motive, we look through the conduct, and from it make the deduction and inference. Generally, this is the only mode of conducting the inquiry. A man must be conclusively taken to intend the natural and logical results of his acts. Upon this principle rests his accountability for the violation of criminal laws. It is equally applicable in civil affairs. If one is actually misled to his prejudice and loss, by the conduct of another, the injury to him is just the same as though the thing were done for the very purpose of deceiving. Thus, too, *if one maintains silence, when, in equity, he ought to speak or act, equity will debar him from speaking or acting when conscience enjoins silence.* So, if by words or acts, another is fairly induced to believe the existence of a certain state of facts, and acts on that belief, so as to alter his previous condition (as by advancing money or property), the former is concluded from averring a different state of facts, as existing at the time. Green v. Price, 1 Mumf. 449; Wilson v. Kimball, 7 Fost. 300, afford illustrations of the principle; also, 2 Mad. Ch. 282.

A few days prior to the date of the deed in trust, Mr. Summers had made a full examination into the business of Baggett. While he thought that he was solvent, his partners, on consultation with them, insisted upon security for their debt. His ultimate condition depended upon the price of cotton and his success in making collections. It was because of the confidence of Mr. Summers in his solvency that he was induced to withhold the deed from registration.

It is shown that Baggett had the confidence of the community in his integrity and solvency, so much so, that he was able to buy cotton, in some instances, on credit, and in others, to ship for planters on his own account, to pay over the proceeds on return of sales. Such continued to be his estimate until it was discovered that he had incumbered his property, all of it (except a small fraction of land), for the benefit of Summers & Brannin. The "natural" and logical effect of a knowledge, by the public, of the existence of this deed, would be to destroy his credit and stop his business, except for liquidation. He could not purchase further supplies of goods to keep up his stock of merchandise, nor could he deal in cotton with the same facilities, and to the same extent, as heretofore. Moreover, his other creditors would become alarmed and uneasy, and would press for some sort of satisfaction. A concealment of the deed, on the other hand, would enable him to prosecute his business. He could buy merchandise on credit, keep his store-house full, and deal largely in cotton. He might be able to pass through the active business season with unshaken credit, and come out successful. At all events, the explosion would be postponed until the speculative experiment had been tried.

But at whose risk was this to be done? It is not to be supposed that the New Orleans creditors would have filled his orders for any goods and groceries, or that Cagle and Gartman would have sold cotton on credit, or that they would have loaned him money, if they had known that his property had been assigned to Summers & Brannin. If these lien creditors have, by their conduct and acts, willfully contributed to give to Baggett a credit that he was not entitled to, although they did not meditate a wrong or injury to others, then they are debarred from setting up any advantage they may have against those who have been drawn in to risk their property or money. The mind cannot escape the conviction that those creditors who dealt with Baggett, subsequent to the 19th of December, did so upon

the assumption that he was the owner, absolutely, of his merchandise and cotton. If Summers & Brannin willfully aided and contributed to hold him out in that capacity, thereby inducing the complainants, or some of them, to alter their condition by becoming his creditors, they ought in conscience to be estopped from averring a different state of facts as existing at the time the credit was given. To apply the principle to the facts ; if Summers & Brannin concealed and suppressed their assignment of Baggett's property, from the nineteenth of December until the thirtieth of January, for the purpose of giving to him all the advantages of a merchant having a large business in buying and selling goods and trading in cotton, as being the apparent owner of all his property, thereby causing others to deal with him and trust him, in the belief that the apparent was the real condition of things, they ought not, as against these creditors, to be permitted to take the benefit of their security. To come to this result it is not necessary to hold the deed itself to be fraudulent in its inception, for as declared (in 1692) by Lord Commissioner Hutchins, in Hungerford v. Earle, 2 Vern. 261, " a deed, not at first void, may become so by being concealed or not pursued, by which means creditors are drawn in to lend their money." The case was : A father made a voluntary settlement to raise money to pay his debts, a portion for younger children, reserving £50 per annum for himself ; the plaintiff was a creditor for money lent twelve years after making the settlement ; the settlement was void because the father continued in possession. So in Wendell v. Van Rensselaer, 1 Johns. Ch. 352, the deed was set aside because it was concealed from the knowledge of the world, whereby false colors were held out, and the public were permitted to consider the property as belonging to the testator, and to treat with him as owner. Cognate to this is that other principle, equally founded in considerations of equity and utility, which affirms that, if one man knowingly, though passively, looks on and suffers another to purchase property and spend money, under an

erroneous opinion of title, without making known his claim, he shall not be allowed to assert his legal right against such person.   It would be fraud and injustice, and he would be put under an equitable estoppel.   East India Co. v. Vincent, 2 Atk. 83 ; Jackson v. Cator, 5 Ves. 688 ; Dann v. Spurrier, 7 ib. 231.

It is because of the necessary tendency to mislead and deceive the public, that a retention of possession, after an absolute sale, is a badge of fraud as against the creditors of the vendor.   In Lear v. Freedland et al., 45 Miss. 559, the creditor was denied satisfaction out of the estate of the decedent, because he had assented to an arrangement by which the devisee was held out as ostensible owner of the property, had obtained credit, and made an incumbrance to secure it.

But the retention of possession by the mortgagor or grantor in the deed of trust is not fraudulent *per se*.   It is consistent with the deed, and cannot deceive.   But, in order that the possession may be innocent, the deed must be recorded, or notice of it brought home to the party before he has the dealings with the mortgagor or grantor.   Bogart v. Gardley, 4 Smedes & Marsh. 302; Harvey v. Park, ib. 229.   Such conveyances operate to give notice from the date of registration.

There is nothing upon the face of the deed to make it void *per se*, as held in 42 Miss. 781, where this instrument was under consideration.   It is entirely legitimate to give a mortgage for a sum certain named in the deed, when that sum is intended to cover future advances.   To the amount named the security is valid as to third parties, but not beyond it.   1 Hill. on Mort. 318.

Under the statute (which was substantially a transcript of 13th Elizabeth), prior to the code of 1857, a majority of the court, in Bullit, Miller & Co. v. Taylor & Richardson, 34 Miss. 740, held that the statute had reference only to creditors existing at the date of the fraudulent deed.   The language is, that the " deed operates to transfer the title to

the property, but transfers it with the incumbrance of the grantor's debts then existing." "It is void as to all who were at the time of its execution in a situation to be injured by it, but valid as to all others." This view is manifestly in conflict with the former adjudications. Bogard v. Gardley, 4 Smedes & Marsh. 310. In Henry v. Fullerton, 13 ib. 634, the chief justice states the rule to be, "that if the subsequent creditor can show that the conveyance was made to avoid future debts about to be contracted, and to defraud existing creditors, it is void, not only as to present but as to subsequent creditors also;" quoting largely the English and American cases. Wills v. Treadwell, 28 Miss. 726 ; 14 Smedes & Marsh. 130. Art. 3, p. 359, Code of 1857, puts the question at rest, by declaring "that the act shall not extend to subsequent creditors, unless made with intent to defraud them, and a conveyance or contract may be deemed void as to prior creditors, but shall not on that account be void as to subsequent creditors."

The complainants, being subsequent creditors, do not establish, under this article, a right to relief, by showing that the conveyance and agreement was made to defraud existing creditors, only, but they must make it appear "that it was done with intent to defraud them." 42 Miss.

The case before us, in its leading facts, is like that of Gill v. Griffith & Schley, 2 Mad. Ch. 282. There the question was, whether the mortgagor can keep possession of the goods, retain the conveyance from record for an indefinite period in order to save the mortgagor from the mortification of giving publicity to his embarrassments, and then record and hold the goods as against subsequent creditors. The statement of the proposition seemed so emphatically to indicate what the answer should be, that the chancellor said, "such certainly should not be the law," and nothing but controlling authority would induce him so to decide. This judgment, condemning the deed, was affirmed by the court of appeals. In that case the same result ensued as evinced in this record (which would have been avoided if

the registry laws had been obeyed), to wit : credit upon the faith of property of which the party was ostensibly the owner. It is not perceived how such an arrangement can operate otherwise than injuriously to creditors, or put them in great risk and hazard. Baggett was to purchase goods as usual (and the testimony shows that it was upon a credit); the deed in trust took effect upon all goods put in the house, or rather upon those in the house when the trustee might take possession. These creditors might watch their opportunity until there was a large stock on hand, much larger than when the deed was made, and, through the trustee, seize upon them, thereby destroying the very means which gave Baggett credit to make the purchases. It was part of the scheme that Baggett should work off, as far as possible, the goods into cotton, which would go to the credit of his account with his factors. They agreed to advance $70 per bale on cotton, then worth $120, thus leaving them a surplus on each bale of $50. The residue to pay for the cotton in the country was made up out of the store in goods or cash, so that the resources of his merchandise business were largely absorbed in these cotton transactions. How were the debts to his mercantile creditors to be met, in such course of business ? Not from the sale of goods. The only mode was a payment of them by Summers & Brannin ; whether they paid or not depended upon the state of accounts between Baggett and themselves. There was no agreement to pay future debts, only some New York creditors, whose demands would shortly mature. When it is borne in mind that, at the date of this transaction, there was a large balance due Summers & Brannin, which was to be liquidated by cotton, which cotton was to be bought in part with goods and their proceeds, it is evident that merchandise thereafter to be bought upon a credit was largely to be absorbed in cotton, which would go to the credit of this balance and other advances. The evidence is, that about $25,000 worth of goods were bought and put in the store after the conveyance was made. Such transactions

gave large advantages to these factors over mercantile cred-
itors, having the effect to use the goods sold by dry goods
and grocery merchants to Baggett to pay his debt to
Summers & Brannin.

Commercial dealing and credit rest upon the predicate
that the proceeds of the goods shall be applied to pay
the parties from whom they were bought, the profits being
the excess of this and expenses.   The arrangement between
Baggett and Summers was antagonistic to the regular and
usual course of business, tended to break down commercial
confidence and credit, and to entail losses upon those who
trusted their goods and property to the retail merchant.
When this aspect of the subject is looked at in connection
with the fact, that the transfer for the use of Summers &
Brannin was to be kept secret, to be produced and take
effect or not as his business might prosper, or be unfortu-
nate; the conclusion is irresistible (however intended in
the minds of the parties), that it was fraudulent as to subse-
quent creditors.

The arrangement between Summers & Brannin is mate-
rially different from that in Foster v. Manufacturing Com-
pany, 12 Pick. 451.   Here the assignment was of all the
property, real and personal, of a manufacturing company,
which left the property with the company until the trustees
chose to take possession, but there was this provision, "that
the proceeds of after acquired property should be applied
to after contracted debts for stock and materials, and labor,
and for the ordinary expenses of the company in carrying
on their operations."   It would seem that this was ample
security for subsequent creditors.   Commenting on this
stipulation the court says : "It was obviously necessary to
enable the company to go on with its business, as it is not
to be presumed persons would be willing to furnish sup-
plies to a company avowedly insolvent without some such
provision."   It was declared however, that the fact of not
taking possession of personal property, made the deed fraud-
ulent, provided the attachments had been served before a

transfer of possession.  We understand the rule to be in Massachusetts, that a mortgage of movable property is void against creditors, unless possession passes with the deed. In the case at bar, as we have seen, so far from provision being made for subsequent creditors, who became such in the ordinary course of Baggett's business, whatever goods or cotton they supplied to him went in effect to liquidate the debt to Summers & Brannin.   The case of Foster v. Manufacturing Co. turned on the fact that the non-delivery of the personal effects made the deed fraudulent.  But, inasmuch as the trustees got possession before the creditors attached, they had lost their opportunity, and could not complain.  According to our law, the grantor may retain the property until after default made in paying the debt, and no presumption against the fairness of the transaction, arises from that fact alone.   Indulgence after that may or may not be fraudulent as to other creditors according to the special circumstances.   There was testimony to the effect that Summers actively promoted the sale of goods to Baggett, after the deed was executed and before it was recorded; and induced the belief that he would accept a bill for their payment.

We are of opinion that the natural and logical effect of the agreement and assignment, and the conduct of the parties thereto was to mislead and deceive the public, and induce credit to be given to Baggett, which he could not have obtained if the truth had been known, and therefore the whole scheme was fraudulent as to subsequent creditors, as much so as if it had been contrived with that motive and for that object.

It follows that the decree of the chancellor must be affirmed.