## THE FLEMINGTON NATIONAL BANK

*v.*

## JOHN L. JONES, GEORGE A. REA et al.

The mere withholding from the record of a mortgage given for full consideration lest it might injure the credit of the mortgagor, is not sufficient evidence of an intent on the part of the mortgagee to hinder, delay or defraud creditors of the mortgagor.

On bill to foreclose. Heard on bill, combined answer and cross-bill, replication and proofs.

*Mr. John A. Bullock* and *Mr. Henry A. Fluck,* for the complainant.

*Mr. H. Burdett Herr* and *Mr. John N. Voorhees,* for the defendant Rea.

PITNEY, V. C.

The complainant asks for the foreclosure of two several mortgages covering the same premises, executed by Jones to one

Dunham to secure him as endorser for Jones, upon certain prom-issory notes made by Jones and discounted by complainant for him. These notes not being paid at maturity, and Dunham, the endorser and mortgagee, having died insolvent, his executors handed the mortgages to the complainant, who now claims to be subrogated to the rights of Dunham, on the ground that as prin-cipal creditor he is entitled in equity to any and all collateral given by the principal debtor to his surety.

The right of the complainant in this respect was not seriously disputed at the hearing, and is beyond question. *Dix. Subrog.* §§ *154, 155; Clapworth* v. *Dressler, 2 Beas. 62; Crowell* v. *The Hospital, 12 C. E. Gr. 650* (at *p. 655*). Besides, the mere de-livery of the mortgage under the circumstances amounted to an assignment in equity.

Complainant's mortgages are first in date and order of regis-tration. The defendant Rea holds the third mortgage upon the same premises. He admits the execution and delivery of com-plainant's mortgages and the amount due from Jones to complain-ant on the notes secured by them, and that both were registered before his mortgage was executed, but claims that the first of complainant's mortgages should not have priority over his mort-gage, because Dunham, the mortgagee, withheld it from the record for a period of eleven years, during which time Rea's indebtedness was incurred.

This first mortgage was dated December 7th, 1880, and was recorded on the 30th of November, 1891. It was given to in-demnify Dunham against his endorsement of a promissory note of that date for a period of eleven years, during which time Rea's indebtedness was incurred.

This first mortgage was dated December 7th, 1880, and was recorded on the 30th of November, 1891. It was given to in-demnify Dunham against his endorsement of a promissory note of that date for $4,000 made by Jones, or any note given in re-newal of the same endorsed by Dunham. The note thus secured was not paid at maturity, but was renewed from time to time and partial payments made on it, until the 4th of September, 1891, when it assumed the shape of a promissory note made by Jones

to the order of and endorsed by Dunham for $3,400 at three months, which was protested for nonpayment.

Mr. Rea's case is set out in his cross-bill thus: In March, 1884, between the date of the mortgage in question and its registry, he and Dunham and three others became surety for Jones on his bond to the ordinary in the penal sum of $50,000, conditioned for the faithful performance of his duties as guardian of one Stryker, an infant, and when (inferentially in 1891) Stryker attained his majority, Jones was found to be indebted to him in the sum of over $8,000, and failing to pay it, Rea and one other of the sureties, being the only ones who were solvent, were obliged to pay, and did pay, each one-half of the amount due to Stryker, whereupon Jones executed a mortgage upon the premises covered by complainant's mortgages to Rea and the other solvent surety to secure them the moneys so paid by them, which mortgage was dated December 21st, 1891, three weeks after the registry of complainant's mortgage.

After this preliminary the cross-bill continues thus:

"And this defendant, in further answering, says that he had no knowledge of the mortgage of four thousand dollars made by said John L. Jones and wife to said Clarkson·C. Dunham or of the indebtedness it was made to secure at the time he became surety for said Jones upon said bond to the Ordinary; that this defendant at that time believed said John L. Jones was solvent and his property clear and unincumbered, and on that account signed said bond as surety; and this defendant has been informed and charges the same to be true that the said John L. Jones was president of the Flemington National Bank the complainant, and the said Clarkson C. Dunham cashier of said bank and also a brother in law of said John L. Jones from the time said mortgage was made until a short time before the death of the said Clarkson C. Dunham, and said Dunham did not place said mortgages upon record or disclose their existence for the purpose of inducing this defendant and others to believe said Jones to be solvent, and to conceal his true financial condition, and this defendant insists that the said Clarkson C. Dunham and the said complainant had full knowledge that said Jones was unable to pay his debts from the time said mortgage was given and fraudulently concealed its existence to help said Jones' credit, who during that time was engaged in the settlement of numerous trusts, and needed security upon the bonds it was necessary to give. And this defendant says that he has been informed and believes it to be true that at the time each of the mortgages held by the complainant were given by the said defendant John L. Jones to the said Clarkson C. Dunham to secure the payment of the notes mentioned in the bill of complaint, the said Clarkson C.

Dunham and wife also executed a mortgage to said Jones to secure said Jones on account of notes he was endorsing for said Dunham, and it was expressly agreed between said Jones and said Dunham that neither of said mortgages should be recorded unless the said Dunham should give notice thereof to said Jones previous to placing them upon the records. And this defendant further shows that neither of the mortgages of the complainant 'was placed upon record during the lifetime of the said Dunham, and charges that said agreement was made between the said John L. Jones and Clarkson C. Dunham for the purpose of deceiving this defendant and others as to the true condition of said Jones financially."

This pleading is under oath as required by the bill, but so much as is pleaded by way of cross-bill cannot be considered as proven by the oath of the defendant, for two reasons. *First.* It is new matter, not responsive to the allegations of the bill (*Beckhaus* v. *Ladner, 3 Dick. Ch. Rep. 152,* and cases cited at *p. 163*); and, *second,* it is not matter about which the defendant is shown to have had any personal knowledge, but is mere allegation in the bill which the defendant therein (the complainant) is called upon to answer.

Complainant, by its replication, denies the material allegations of the cross-bill with regard to the object and purpose of withholding the mortgage from record.

Rea died before the case was brought to a hearing.

At the hearing it appeared that Jones and Dunham were brothers in law, and one was president and the other cashier of the complainant. Jones was sworn and testified, subject to objection seasonably made by complainant, as to a conversation with Dunham at the time of giving the mortgage in question. The objection to the competency of this evidence was not well taken. Dunham's personal representatives are not parties to the suit, although they are directly interested in the event, and therefore the case is not within the provisions of the statute of February 25th, 1880. *Rev. Sup. p. 287.* If they had been made parties the objection to Jones giving evidence of conversation between him and Dunham would have been serious.

Jones swears that when the mortgage was executed and delivered the understanding between Dunham and himself was " that he was not to place it on record without notice to me," and that

the knowledge of its existence " was to remain between him and me—we were to say nothing about it ; " that neither himself nor, so far as he knew, Dunham ever told any one of its existence. When asked whether any reason was assigned between Dunham and himself for keeping the mortgage from the record and its existence secret he answered : " I suggested to Mr. Dunham that as I was president of the bank it would perhaps injure my credit." He further stated that the reason why he desired notice of putting the mortgage on record was that he might have the opportunity to arrange to pay the note without having it go upon the record at all. He was asked if at the date of the mortgage in 1880 he was able to pay his debts and answered : " I think it was doubtful." He further testified that he openly acknowledged his insolvency and resigned the presidency of the bank December 2d, 1891, five days after Dunham's death and two days after the recording of the mortgage. He said that up to that time he had not supposed he was in such financial condition—" I was not aware I was in the financial condition I was—not so badly insolvent ; didn't realize it." He further testified that he was doubtful in 1880 whether he was solvent, and that he had gone behind and his financial condition had deteriorated between 1880 and 1891, and that so far as he knew his credit was good, and that *during that time he told no one whatever and intimated to no one that he was unable to pay all he owed.*

There is no proof that Dunham had any knowledge or suspicion up to the moment of his death that Jones was pecuniarily insolvent. He joined with Rea and others as sureties on the bond to the ordinary. There is no proof that Rea joined as surety on this bond on the strength of Jones' real estate being unencumbered. On the contrary, it appears that he made no search or inquiry on the subject. There is no proof as to the character of the business in which Jones was engaged, whether what is called " hazardous " or not. In fact there is no proof that he was engaged in any business whatever except that of performing his duties as president of the bank. There is no proof that he ever acted as executor, administrator, guardian or in any other fiduciary capacity except on the occasion referred to.

It was proven that Dunham gave Jones a mortgage under date of April 1st, 1881, to secure him for his endorsement on Dunham's notes, which was not recorded until December 3d, 1891; but there is no proof that Dunham ever came under any obligations to Jones on that account.

This statement of the evidence shows that the defendant has not sustained by proofs all the facts set up in his cross-bill as the basis of his claim for relief against the complainant. Nevertheless his counsel contended with great earnestness and ability that his mortgage is entitled to priority over the one in question.

In considering his argument, it must be borne in mind that the complainant's mortgage was given for a full and valid consideration. It stands in all respects as if it had been given directly to the bank for so much money loaned, and the rules governing voluntary conveyances can have little, if any, application; and if it had been made and executed on the day before Dunham died and recorded when it was, there could have been no question as to its priority, although the debt it secured had been in existence for never so many years.

The defendant's case must stand or fall upon the bare fact that complainant's cashier having a mortgage given to himself to secure himself for endorsing the maker's note to be discounted by the complainant, and so, in effect, given to secure the complainant directly, refrained at the request of the maker to place it on record until after the maker had become indebted to another person, such other indebtedness not being in the mind of either party at the making of the mortgage, and the cashier having no knowledge or suspicion of the maker's insolvency.

In order to postpone such a mortgage to one executed and recorded subsequent to its record, it is necessary to hold the mortgage itself void as against such subsequent mortgage creditor. In order to do that it is necessary to find that the mortgagee was guilty of what is known as actual fraud as distinguished from constructive fraud; for it is well settled that a conveyance or mortgage made or given for full and valuable consideration can only be impeached by another creditor on the ground of actual fraud, in which the grantee or mortgagee has himself partici-

pated. *Merchants' Bank* v. *Northrop,* 7 *C. E. Gr. 58;* *Holt* v. *Cremer,* 7 *Stew. Eq. 181;* *Muirheid* v. *Smith,* 8 *Stew. Eq. 303;* *Roe* v. *Moore,* 8 *Stew. Eq. 526;* *Prewitt* v. *Wilson,* 103 *U. S. 24;* *Wait Fraud. Con.* §§ *191, 201;* *Big. Fraud. Con. 398, 490.*

The index of fraud here relied upon is the failure to record the mortgage, whereby the mortgagor was enabled to enjoy a fictitious credit by reason of the supposed ownership of property free of encumbrance. In considering the value of this item it must be borne in mind that it was not the mortgage which prevented the mortgagor from being able to pay his debt, but the debt which it secured, and it will hardly be contended that there was any fraud on the other creditors of Mr. Jones in not publishing to the world the fact that he was indebted to the bank in the sum of $4,000. But before we can charge Mr. Dunham with conspiring with Mr. Jones to give him a credit which he was not entitled to, and thereby enabling him to contract debts which he could not pay, we must bring home to Dunham knowledge either that Mr. Jones was unsound financially and unworthy of credit, and was likely to seek to obtain credit, or that he was then engaged in, or was about to engage in, some business or speculation of a hazardous character in which he was liable to incur pecuniary obligations and to lose more or less of the capital which he had invested in it. I am unable to perceive how Mr. Dunham could have combined with Mr. Jones in a plan to defraud present or future creditors in the absence of one or some of these conditions, and they are all absent.

The case is equally bare of any feature or circumstance which tends to show that Dunham had any suspicion that Jones was then unable to pay his debts or that he was likely to be so in the future. I think the conduct of the parties, and the so-called agreement to keep the mortgage from the record, fall far short, standing alone, to show any fraudulent intent. Consider the circumstances. Jones was president and Dunham was cashier of the bank. It was the duty of both to keep the bank secured on all discounts. The note of one officer endorsed by the other, and that other his brother-in-law, was an asset that was likely to attract the attention of the directors if they examined the assets,

and also of the federal bank examiner, and it was highly proper;. no matter how strong financially Jones might be, that he should give a security which should, in case of his death, or other unexpected occurrence, make the bank quite secure, and so the making of the mortgage was quite natural and proper and not suspicious, no matter how sound financially the mortgagor might be.  The case does not show, but it was assumed on the argument, and is quite in keeping with common knowledge, that the note was drawn payable in a short time—three or four months—and so with its renewals.   Now, it seems to me that the request to keep the mortgage from the record and to record it without notice to Jones, so as to give him the opportunity to pay the indebtedness without having the mortgage recorded at all, was not unreasonable, and granting it under the circumstances not sufficient evidence of fraud.   The putting of it on record would give the world notice that the president of the bank was borrowing money from it, and that was not a desirable thing to have known, no matter how rich he was.

In point of fact, it does not appear that any one was misled by the absence of this mortgage from the record.   Mr. Rea did not examine the record or make any inquiry when he signed the guardian's bond.   In so doing he was not singular.   The credit of a man like Mr. Jones, living in a village like Flemington, depends upon his general reputation among business men.   Moreover, in considering the question whether or not it was safe to sign his bond as guardian, the inquiry would be not so much as to whether he was rich or poor, or whether his house was mortgaged or not, as whether he was an honest man—one who would not appropriate trust funds to his own use, but keep them separate from his private funds—and whether he had business capacity sufficient to perform his duties in that behalf in such a manner as not to lose any portion of the estate by sheer negligence.   Both of these he was supposed to have, and the loss which has occurred was not at the argument attributed to a lack of business capacity on his part.   The names of his neighbors who became his sureties are ample guarantee of his possession of that quality.

Again, it is to be observed that the case is bare of any affirma-

tive declaration by Dunham that Jones was solvent. There is no pretence that Rea made any inquiries of Dunham as to Jones's pecuniary responsibility before signing his bond to the ordinary. All that appears in that connection is that each knew that the other was about to sign it and, so far as appears, Dunham at that time was solvent and supposed Jones was in the same condition.

I have examined all the decided cases cited by counsel and find that none of them go so far as I am asked to go here.

*Folsom* v. *Clemance, 111 Mass. 273,* was a case of a mortgage of chattels given by a firm of dealers in clothing to a favored creditor, with the understanding that it was not to be put on record unless the mortgagors got into trouble, and 'this occurred at a period when the National Bankruptcy laws were in force, which made void any mortgage or preference made within four months before the bankruptcy, and this provision naturally made creditors who were desirous to gain a preference adopt some scheme to keep their debtor afloat until after their security had passed the statutory limit. The judge charged the jury in this wise : " If there was an arrangement between Grover & Harvey and the plaintiff that the mortgages should not be recorded in the usual and ordinary course, for the reason that the recording thereof would injure the credit of the mortgagors or otherwise, and the plaintiff did not get them recorded till he feared the mortgagors would not be able to pay, that was a matter entitled to consideration by the jury in passing upon the question whether the mortgages were given and received with the intent to hinder, delay or defraud creditors." The jury found in favor of the mortgagee, and the charge of the judge was approved and the verdict sustained at bar.

The case differs from the one under consideration in that the mortgagors were engaged in a hazardous business in which credit was needed and in which creditors were likely to give credit on the strength of a large stock of goods not encumbered by judgment or mortgage. This ruling was followed in the much debated case of *Stewart* v. *Hopkins, 30 Ohio St. 502* (at *pp. 529, 530*), and the mortgage there upheld. The mortgagors were merchants engaged in a hazardous business.

Flemington National Bank v. Jones.

In the leading case of *Blennerhassett* v. *Sherman, 105 U. S. 100*, the mortgagor was hopelessly insolvent to the knowledge of the mortgagee at the date of the mortgage, and it was kept from the record to enable the mortgagor to postpone open bankruptcy long enough to give the mortgage sufficient age to have preference under the Bankrupt law, and in the meantime the mortgagee represented the mortgagor to be solvent and actively aided in bolstering up his credit. Justice Woods (at *p. 117*) says : " Neither can it be denied that the mere failure to record a mortgage is not a ground for setting it aside for the benefit of subsequent creditors who have acquired no specific lien on the property described in the mortgage. But where a mortgagee, knowing that his mortgagor is insolvent, for the purpose of giving him a fictitious credit actively conceals the mortgage which covers his entire estate and withholds it from the record, and while so concealing it represents the mortgagor as having a large estate and unlimited credit, and by these means others are induced to give him credit, and he fails and is unable to pay his debts thus contracted, the mortgage will be declared fraudulent and void at common law, whether the motive of the mortgagee be gain to himself or advantage to his mortgagor."

*Coates* v. *Gerlach, 44 Pa. St. 43*, was a case of voluntary conveyance.

*Bank* v. *Housman, 6 Paige 53*, was also a case of a voluntary conveyance, and the cashier of the plaintiff bank swore that he loaned the money forming the basis of plaintiff's judgment on the strength of the unencumbered ownership of the property in question. This case has been relied upon in some of the subsequent cases hereafter to be considered, without observing that the conveyance declared void was without consideration.

In *The Standard Paper Company* v. *Guenther, 67 Wis. 102*, the case was this : Plaintiffs furnished printing paper to a publishing company, which, being embarrassed, gave a chattel mortgage to Guenther upon all its plant, with the understanding that it was not to be recorded unless it got into trouble. The plaintiff sold the mortgagor printing paper after the execution of the mortgage and before its registry, and in so doing relied upon the fact

that the plant was unencumbered, having examined the records for liens.    It was held that the defendant's mortgage must give place to the plaintiff's judgment recovered after it was recorded.

Here, also, it must be observed that the business was hazardous; that the desperate condition of the mortgagor was known to the mortgagee; that the mortgage was kept from the record for the purpose of bolstering up the debtor's credit, and that the subsequent creditor relied upon the unencumbered condition of the debtor's plant.

In *Fetters* v. *Duvernois, 73 Mich. 481,* the deed set aside was voluntary, was made by the husband to his wife as a testamentary conveyance when the husband was ill and upon the understanding that it was not to be put on record except in case of pressing insolvency.    The court, in the prevailing opinion, said: " We think the deed void as against the plaintiff, the judgment creditor, not only as a voluntary deed and, therefore, legally fraudulent against creditors when made, but because of its treatment by both parties since, whereby creditors had no warning of its character and were not intended to have any."

In *Central National Bank* v. *Doran et al., 18 S. W. Rep. 836,* decided by the supreme court of Missouri, March 14th, 1892, the mortgagor was the owner of large farms and was largely engaged in dealing in cattle upon credit.    The facts relied upon are thus stated in the report: "After giving said deeds of trust (there withheld from record) Doran continued to buy stock extensively, and to trade in Cooper and adjoining counties, and that this fact was well known to the defendants Bartle (grantee in the deed of trust) and the State Savings Association (assignee of it); that at the time said deeds of trust were executed it was expressly agreed by the said Bartle that the same should be withheld from record, and the existence thereof should be concealed, so as not to injure or impair the credit of said defendant Doran in the community where he was living and trading; that before said note was transferred to the State Savings Association the said State Savings Association had notice of said agreement to withhold said deeds of trust from record, and conceal the execution thereof, and consented thereto; that, in pursuance of said agree-

ment·and understanding, said deeds of trust were withheld from ·the·record, and the existence thereof kept a secret ; that with the .knowledge and consent of defendants Bartle and the State Sav-.ings Association, defendant Doran continued to carry on his busi-.ness in Cooper county ; that the arrangement to withhold said deeds of trust from record gave said Doran a false and fictitious credit in the community." And the court, in postponing the mortgage so withheld from the record, relied, among other cases, ·upon *Bank* v. *Housman,* above cited, which, as before remarked, is no authority for such decision.

Here, again, we have the element of the mortgagor being en-·gaged in a hazardous business, making purchases on credit, and the mortgage being withheld from the record for the express purpose of giving the mortgagor a credit to which he was not ·entitled and to enable him to use it in making purchases on credit.

In *Stockgrowers' Bank* v. *Newton, 13 Colo. 245,* the case was this : The defendant was a secret partner in a firm of lumber manufacturers, and withdrew from the firm by selling to the ·other partners his interest and taking notes for the amount, ·secured by a trust deed covering the realty of the firm and a ·chattel mortgage on their personalty, which, by written agree-ment, was "not to be recorded, as provided by law, that it may not affect the financial standing of the firm." Six months later ·the firm failed and made a new trust deed and a new chattel ·mortgage to the defendant, which was at once recorded. The ·plaintiff was a creditor by note before the defendant retired from ·the firm and renewed the note after the retirement and before the failure, upon representations by the defendant that the firm was doing well and were good. The court held that the new instru-ment was infected with the vice of the old one, and used this .language : " The doctrine is elementary that concealment of mat-·ters which the policy of the law require shall be made public, as ·the withholding of a deed or mortgage from the record for a con-·siderable time, is a badge of fraud.  *   *   *   The withholding of a mortgage from the record is evidence of fraud, for the reason ·that from such withholding an intention to keep persons dealing

with the mortgagor in ignorance of his true financial standing-
may be implied. When the grantor of a trust deed and the
beneficiary agree together that the trust deed is not to be recorded,.
as provided by law, that it may not affect the financial standing
of the grantor, the evidence of fraudulent intent become express.''
Upon this and the subsequent representation made by the defend-
ant to the plaintiff, the court set aside the defendant's deed. Here-
there was evidence of express fraud.

*Lehman & Co.* v. *Van Winkle, 96 Ala. 443,* was decided upon
a demurrer to the bill, which set out the facts as follows : Com-
plainants contracted with a firm of merchants and cotton ginners
to erect for them a cotton gin, which, when finished, the merchants
were unable to pay for and upon which the complainants had by
statute a mechanics' lien. Prior to the expiration of the lien the
merchants executed a mortgage covering the gin, with other prop-
erty, to the defendants, which was not recorded. After this
mortgage was executed, and in ignorance of its existence, but
while their mechanics' lien was still good, complainants waived
their lien and took promissory notes of the merchants expressed
to be in payment of the cotton gin, but reserving title to the gin
until the notes were paid. The result was, in the opinion of the
court, that the statutory mechanics' lien was gone, and the de-
fendant's mortgage, if upheld, was prior to the lien reserved in
the promissory notes. The allegation was that the mortgage was·
kept from the record lest it might affect the standing and credit
of the mortgagors as merchants who were actually insolvent at
the time to the knowledge of the defendant ; and, further, that
"the purpose and intent of the parties thereto in withholding it
from the record was to mislead the public as to the existence of
the mortgage, and to give the mortgagors an advantage in dealing
with their creditors and the public which they would not have
had the mortgage been recorded." The bill was held good on·
the authority of *Blennerhassett* v. *Sherman, 105 U. S. 100,* and
*The Mobile Savings Bank* v. *McDonald, 87 Ala. 736.* The head-
note of this last case is as follows : "An unrecorded mortgage·
which after several renewals is at last recorded within the time
allowed by the statute is not void as against simple contract cred--

itors whose debts were incurred in the meantime, unless it was withheld from the record for the fraudulent purpose of upholding the credit of the debtor or is otherwise impeached by proof of actual or positive fraud on the part of the mortgagee, and the *bona fides* of the deed being admitted, and it not being shown that the mortgagee had notice of the debtor's insolvency, the charge of fraud is not sustained." In the course of its opinion the court says: "To make the withholding of the instrument from the record fraudulent, especially as to debts afterwards created, it must have been for the purpose of upholding fictitiously the credit of the mortgagor so as to enable him to obtain money or goods of others which he would not be likely to do if the instrument was recorded. In other words, there must have been actual intent to defraud resulting in damage to some creditor of the grantor." And the court disapproves of the case of *Hilliard* v. *Cagle, 46 Miss. 309.*

I stop here to observe that the statutes of this and some other of the western states make a mortgage absolutely void unless recorded within a certain time.

In *Hildebron* v. *Brown, 17 B. Mon. 779,* the contest was between an unrecorded mortgage and an assignee for the equal benefit of creditors. The mortgage was given with a blank date and an understanding that if the mortgagor was in danger of failing he was to fill in the date and himself lodge it for record. The court say, in its opinion, that concealment is opposed to the general policy of the law requiring the public registration of all liens and encumbrances upon property permitted to be retained and claimed by the debtor.

In *Hilliard* v. *Cagle, 46 Miss. 309,* a country merchant, cotton raiser and cotton dealer gave a mortgage on all his property, real and personal, to his commission merchant in New Orleans to secure a present debt and future advances at a time when his financial situation was doubtful, and the mortgage was kept from the record in order to enable him to continue in business and to buy more cotton on credit, together with other peculiar circumstances in the case, and the mortgage was held void as to his other creditors.

*Klein* v. *Richardson, 64 Miss. 41,* was a case of a deed by a banker to his mother for a full consideration, and kept from the records a year, and put on record the day before the failure of the bank. Held good, in absence of actual fraud, it not being shown that the mortgagee had notice of the debtor's insolvency. The charge of fraud was held not to be sustained. The case was distinguished by the court from *Hilliard* v. *Cagle.*

In *Root* v. *Hare, 62 Mich. 420,* the court says : " In our state any creditors have the right to avoid an unrecorded mortgage who have during its absence from the record done anything material which they may be fairly construed to have done on the basis of its non-existence."

In both Kentucky and Michigan unrecorded conveyances are void as against creditors.

There are other cases in the same strain scattered through the reports of the western courts, but none that go farther in defendant's favor than those above cited. It is enough to say of all of these that each of them contained facts tending strongly to prove actual fraud on the part of the mortgagee of the unrecorded trust deed or mortgage not found in the case in hand.

But it must be confessed that some of them contain assertions on the part of the judges that the mere withholding such an instrument from the record for the purpose of helping the mercantile credit of the mortgagor is, of itself, plenary proof of actual fraud such as will postpone it to the judgment of creditors recovered after its record. I am unable to accede to that doctrine, since I do not find sufficient warrant for it in the precedents upon which we in this state rely. The judges declaring this doctrine refer in its support, so far as they rely on the ancient precedents, to those cases where a subsequent *bona fide* purchaser or mortgagee has been given precedence over a prior conveyance or mortgage which has been concealed. In so doing they advance the mere unsecured creditor to the position of a *bona fide* purchaser, mortgagee or judgment creditor, which seems to me to be going beyond what the cases warrant, and they also in substance deprived the debtor of the right to prefer his favored creditors.

And here it is worthy of notice that a person who holds an

unrecorded mortgage given for value is liable to have his security destroyed by the act of his debtor, by conveying, mortgaging or confessing judgment to a *bona fide* purchaser, mortgagee or creditor, so that his security amounts, at best, to nothing more than an agreement on the part of his debtor to prefer him as a creditor in case of his inability to pay all his debts. Now, such an agreement has never been held *per se* to be fraudulent. In order to render it so it must be connected with some scheme to enable the debtor to incur an indebtedness which he has no reasonable prospect of paying, and thus hinder, delay and defraud such prospective creditor.

Again, the only difference that I can perceive between the mere refraining by the creditor from publishing to the world that his debtor owes him so much money without any security, and his mere refraining from putting his mortgage on record, where he has one, is that in the latter case he conceals the fact that he is unwilling to trust his debtor without a certain security, which, after all, is but precarious at best.

A practice has prevailed in the western part of this state for a century or more of taking as security for money loaned not only the debtor's bond secured by mortgage on land, but also his warrant of attorney to confess judgment on the bond, and in many instances judgments have been entered on such warrants several years after the debt matured. The same practice has prevailed, and still prevails, in the neighboring State of Pennsylvania where the ancient practice, once in vogue in this state, of incorporating the warrant for judgment in the body of the bond, bill or note still prevails. And yet I am not aware that it has ever been held, or even contended, that a delay for any considerable time to enter the judgment by virtue of the warrant was a badge of fraud on the part of the obligee. Here it will be observed that the warrant of attorney to confess judgment is, in substance, an unrecorded mortgage upon all the debtor's lands and chattels.

Finally, it does not seem to me that the mere fact that a mortgage is withheld from the record in order to avoid an injurious effect which its record might have upon the mercantile or general credit of the debtor is sufficient evidence of fraud. Financial

credit is in a measure necessary to the success of many, if not all,. business enterprises, and a man with a reasonable amount of capital and business capacity and enterprise may fail without it where he would succeed with it. This has been proved in thousands· of instances. Hence to refrain from injuring the credit of such. a person by publishing the amount of his indebtedness is a legitimate aid to him in his enterprise and does not tend to defraud. his creditors.

For these reasons, I am of the opinion that the case does not disclose any fraud on the part of Dunham, the mortgagee of this· mortgage, or of the complainant, and that complainant is entitled. to priority for both its mortgages.