HARRISON JOHNSTON ET AL. *v.* COLUMBUS INSURANCE AND
BANKING COMPANY.
EDWIN T. MOORE ET AL. *v.* SAME.
JOHN S. ROBERTSON ET AL. *v.* SAME.

· THREE CASES.

FRAUDULENT CONVEYANCES.   *Withholding deed from record.   Agreement.
Fictitious credit.*

The withholding from record of a deed:

(*a*) Is not fraudulent as against the creditors of the grantor where
it results from mere inattention, indifference, or agreement, with-
out fraudulent purpose to give the grantor a fictitious credit; but

(*b*) For a bank to withhold a deed to it from record by agreement
with its president, the grantor, in order to give him a fictitious
credit, is a fraud in fact as against the president's creditors who
became such without notice of the deed, and the bank's claim
thereunder will be postponed to the rights of such creditors.

FROM the chancery court of Lowndes county.

HON. JAMES F. McCOOL, Chancellor.

Johnston and others, Moore and others, and Robertson and
others, the respective appellants, were complainants, respective-
ly, and the Columbus Insurance and Banking Company, the ap-
pellee in each case, was defendant in each of the cases, in the
court below. From a decree in defendants' favor in each case,
the complainants appealed to the supreme court.

The complainants in each of the suits were unsecured credi-
tors of the estate of John M. Billups, deceased. The said Billups
in his lifetime, and for about thirty years next before his death,
was president of the defendant, and appellee, the Columbus In-
surance and Banking Company. His estate proved to be hope-
lessly insolvent. The object of each of the suits was to have can-
celled as fraudulent certain deeds executed November 5, 1894,
by Billups to the bank and to subject the property which said

deeds purported to convey to the bank to the payment of the complainants' debts. The facts are stated in the opinion of the court.

*Orr & Harrison,* and *McWillie & Thompson,* for appellants, Johnston *et al.;*

*Linton D. Landrum,* and *Green & Green,* for appellants, Moore *et al.;*

*Betts & Sturdivant,* and *Newman Cayce,* for appellants, Robertson *et al.*

On the 5th day of November, 1894, John M. Billups was the president of the Columbus Insurance and Banking Company, and was largely indebted to it. On that day he executed to the bank four instruments of writing, conveying to it all the property he owned in the world, including insurance on his life, and his future earnings as president of the bank.

Before said date Billups, the president of the bank, had for years been regarded as one of the rich men of the country, and evidently enjoyed the reputation. He lived sumptuously, and was esteemed by his neighbors as a financier of great ability.

In truth, however, at said time he was insolvent. Had all his assets been collected and applied to his debts, the proceeds would have fallen far short of paying his debts. His associates in the bank, one of whom, as a notary public, took the acknowledgments to the foregoing instruments, knew of no property owned by him when the deeds were executed which was not conveyed thereby.

President Billups, however, was unwilling for the world to be advised of his insolvency or of the true status of his financial affairs; he had too long enjoyed the reputation of being rich, and tasted its sweets, to be content to be numbered with the insolvent, and was unwilling to suffer the evils consequent of being known to be poor. He therefore requested the bank, the other officers of which were his personal friends and associates, and four out of six of them related to him or his family by consanguinity or

affinity, not to put of record any of said instruments. Their record would have published his insolvency, his real financial status, and would thus have brought upon him the evils he desired to escape. We do not assert that President Billups had in mind the contraction of any particular debt which he did not hope to pay. Such a contention is not essential to the legal rights of our clients. It is manifest, however, that he did intend to preserve the reputation which he had previously enjoyed of being a wealthy and thoroughly solvent man, with all the incidental advantages of such a reputation in contracting debts. What did the bank do with this request? Why, it granted it; deposited all the instruments in its vaults, and there they remained, known only to the officers of the bank, until two days before President Billups died, and his death occurred August 11, 1902, *seven years, nine months, and six days* after the execution of the instruments. Two days before his death, and when he was known to be desperately ill, on his deathbed, the bank sent the deeds to the clerk of the chancery court, *with instructions to file and record them after the death of Billups.*

The officers of the bank tell us why the request of President Billups to withhold the instruments from record was granted by it. Harris, one of the directors, says in his testimony: "It was not recorded on account of Major Billups begging them not to do it for the present—a matter of pride with him more than anything else, I think. And his request was acceded to as a matter of personal consideration. That continued for fifteen months or longer; after I left there I do not know anything about it." Banks, the vice president of the bank, testified that the instruments were not recorded "at the request of Major Billups." Lee, the cashier of the bank, whose duty it was to see that instruments were recorded, testified that the instruments were not recorded at the request of President Billups and out of personal consideration to him, and that the request was renewed from time to time, and on each occasion was granted for personal consideration of Billups; and the same witness tells us that there

was hesitancy on the part of the officers of the bank to have the instruments recorded at the time they were sent to the clerk with the instructions to file and record them upon the death of the grantor.

But to return to the date, November 5, 1894, of the execution of the instruments by President Billups to the bank. The bank at the same time agreed, for an asserted consideration of $900.80 (the exact sum to a cent of 8 per cent interest on the debts which it is pretended were paid by the execution of the deeds), to lease President Billups the plantation conveyed by the fee simple deed and all the personal property described in the bill of sale. This contract of lease seems to have been verbal, and it was renewed, as is claimed, from year to year as long as President Billups lived. The lands and personalty were assessed to President Billups at the time of the execution of the deeds and remained so assessed, although there were two or more new assessments, until Billups died in August, 1902. Billups paid the taxes himself to all appearances as if the property was his own, although in so doing he may have used the money of the bank. President Billups ran the plantation and sold the crops after the execution of the deeds just as he had done before. His transformation from a fee simple owner of the lands and the absolute owner of the personalty to a tenant and hirer was manifested only by the secret deeds on deposit in the vaults of the bank and the parol lease which was known only to himself and the bank's officers. In fact, the bank, as we are told by Cashier Lee in his testimony, paid no attention whatever to the personal property, worth $2,200, but allowed President Billups to do with it as he pleased. Think of Twyne's case, 3 Coke, 80; 1 Smith's Leading Cas., 33. President Billups, like Farmer Pierce in that celebrated case, conveyed to the bank everything he had in the world, so far as this record shows. Such self-denial is the cloak of fraud. President Billups, like Farmer Pierce, continued in possession, and by reason thereof traded and trafficked with others and deceived and defrauded them. The

conveyances, too, like Farmer Pierce's, were made in secret—a very suspicious circumstance. But the point to it all is' this: The world was kept in the dark about the whole transaction, and President Billups was enabled to and did maintain his reputation of being a wealthy, certainly a thoroughly solvent, man, when in truth he was poor and insolvent. He was enabled to and did obtain credit which would have been denied him had the true status of his financial affairs been known. These complainants and appellants at least were deceived and defrauded by him. President Billups was allowed for years to pose in the community as a thoroughly solvent man, when in fact he was insolvent, and thereby enabled to contract debts which he otherwise could not have done.

Let us see if the bank is responsible for this. We are fully aware of the decision of this court, in the case of *Day* v. *Goodbar*, 69 Miss., 687, wherein this court adjudged that the withholding of a deed from record does not render it fraudulent *per se* as to third persons, who, without notice of it, extend credit to the grantor, and we do not complain of said decision. Our case is easily, we think, distinguishable from that one.

In order to show the distinction, we will first inquire and state what the Goodbar case was. It was this: The chancellor there held that the simple withholding of the deed from record was a fraud *per se*. See last paragraph of the reporter's statement of the case, 69 Miss., 688. This being true, nothing else was before the supreme court than the question whether the simple failure to record a deed was fraudulent *per se,* because the court below had decided nothing else, and the appellants there had been denied a decision of any other question. There was in the case an averment in the bill of the creditors to the effect that the deed was withheld from record, and that it was so withheld by agreement with the grantor, but the answer denied that it was so withheld. There was some evidence tending to show an agreement that the deed should not be recorded (p. 688), but it fell short of establishing it. The chancellor did not decide that such

an agreement was made. If, therefore, there can be tortured from the opinion in that case (something that cannot, we think, be reasonably done) the semblance of an idea that it is an authority for the proposition that an agreement to withhold a deed from record is not fraudulent, the utterances of that opinion, which look in that direction, are mere *obiter dicta,* and are not authority. We most heartily acquiesce in that decision; a mere failure to record is not a fraud *per se.* While the Goodbar case elaborates the question more than was done in the preceding case of *Klein* v. *Richardson,* 64 Miss., 41, yet the real decisions in the two cases are identically the same.

We come now to the case at bar. Appellants present a good deal more than a mere failure to record a deed. A failure to place a deed of record may result from mere negligence or forgetfulness; it may spring from an idea that the recording is useless, that the expenditure of the recording fee is unnecessary—in all of which cases the failure is not *per se* a fraud. But when it proceeds, in compliance with a request of the grantor and out of consideration for him, as in this case, and for his accommodation or gratification, even where the motive be, as was most likely the case here, to conceal from the world the true status of his financial affairs, then a very different question is presented from the one decided in the Klein case and the Goodbar case, not to mention in this connection several other things done by the bank, hereinafter mentioned, which had no counterparts in said cases.

Here the bank purposely, not merely negligently, withheld the deeds from record. This was done at the request of the grantor and out of consideration for him, for his accommodation or gratification. The result was that he was enabled to contract the debts due the complainants, which he could not otherwise have done. It enabled President Billups to pose as a wealthy and perfectly solvent man, when in truth he was poor and insolvent. The bank was itself unwilling for it to be known that its president was an insolvent.

*In this case the bank purposely contributed to, and is there-*

*fore responsible for, the creation of the condition of affairs which enabled President Billups to deceive and defraud complainants and appellants.* · This it did:

(*a*) By withholding the deeds from record at the grantor's request and for his accommodation and gratification.

(*b*) By permitting President Billups, under the guise of a lease, to manage and control the plantation and all the personal property belonging to it and the crops grown upon it, so far as the world could see, just as he had done before the deeds were executed, his transformation from an owner in fee to a mere tenant being a bank secret; and by permitting the lands and property to be assessed to Billups.

(*c*) And, in addition, the bank gave its financial and moral character certificate to Major Billups by retaining, reëlecting him, time and again, as its president, knowing that the very position—president of a bank—enabled him to pass in the community as a solvent and sagacious business man. Put all these things in contrast with the mere negligent failure to record a deed, and you have this case in contrast with the Goodbar and Klein cases.

The doctrine announced in the case of *Hilliard* v. *Cagle,* 46 Miss., 309, may have been too broadly stated, but that part of it which was correctly announced covers this case. The statement of Judge Campbell in the opinion of this court in the Goodbar case, 69 Miss., 690, to the effect that the cases cited by Judge Simrall, in the opinion in *Hilliard* v. *Cagle,* on the subject of equitable estoppel, have no place in a discussion of the registry laws or a question of fraud, is pure *obiter dictum;* and, with all due deference to the learned judge, is untrue, save only in those cases, like the Klein and Goodbar cases, where nothing more is shown than a mere failure to record an instrument. In cases like *Hilliard* v. *Cagle,* and this case, where the failure to record an instrument was an intentional one, adopted at the request and for the accommodation of the grantor, who was permitted by the grantee to pose before the world and obtain credit

as the real owner of the property after, as before, the execution
of the deed, it seems to us that the doctrine of equitable estoppel
should be quite prominent in the discussion. But, however this
may be, Judge Campbell tells us that the opinion in *Hilliard* v.
*Cagle* is valuable (and therefore correct), "as showing a state of
facts which led the court to the conclusion that the scheme there
condemned was fraudulent as to subsequent creditors." Let us
therefore see what that scheme was, and if there is not great
similarity between it and the case at bar. Of course the scheme
in the *Hilliard* v. *Cagle* case was not condemned because the
mortgage was upon a stock of merchandise (that doctrine came
into our law afterwards), because the court expressly decided
that the deed was valid, and it had been decided valid in a
previous case. See 46 Miss., 341, next to last paragraph on
the page. What are the similarities between that case and this
one? They are these, at least:

(*a*) There Baggett, the grantor, was largely indebted to Sum-
mers & Brannin, the vendees; here Billups, the grantor, was
largely indebted to the bank, the grantee.

(*b*) There Baggett, the grantor, insisted that the deed should
be withheld from the record for a time because it might impede
and embarrass his business, and this was assented to by the gran-
tees; here the grantor requested that the deeds should not be re-
corded at all. What for? The most charitable view than can be
taken of it is to assume that it was to enable him to pose as a sol-
vent man, when, in truth, he was insolvent. The bank knew that
he had some purpose in making the request, and yet it lent its aid
and consented to and did not record the deeds until after Presi-
dent Billups died, and the officers of the bank were unwilling
to be instrumental in their record during his last illness, for fear
of the consequences of doing so in case of his recovery.

(*c*) There Baggett was to continue in business; here Billups
was to be continued as president of the bank, was to carry on
his farming interest as before, and, necessarily, was to contract
debts in so doing as well as in maintaining his palatial home.

(*d*) There the testimony did not convince the court that an actual fraud was intended, and so in this case, if we concede that actual fraud was not intended, the cases are still parallel.

(*e*) There both parties believed the grantor solvent, while here it is incredible that both parties did not know that Billups was insolvent—a circumstance which makes this case stronger in favor of creditors than that one.

Assuming that no actual fraud was intended, the language of Judge Simrall, in *Hilliard* v. *Cagle,* is surely applicable: "If one is actually misled (said Judge Simrall) to his prejudice and loss by the conduct of another, the injury to him is just the same as though the thing were done for the very purpose of deceiving. Thus, too, if one maintains silence, when, in equity, he ought to speak or act, equity will debar him from speaking or acting when conscience enjoins silence. So, if by words or acts (and, we will add, a deliberate failure to act) another is fairly induced to believe in the existence of a certain state of facts, and acts on that belief, so as to alter his previous condition (as by advancing money or property), the former is concluded from averring a different state of facts as existing at the time."

Were not these complainants misled to their prejudice and loss by the conduct of the bank in agreeing to President Billups' request, for his accommodation, not to record the deeds, and in permitting him, to all intents and purposes so far as the world could see, to remain ostensibly the owner of the plantation and all the personalty thereon and to reap and dispose of the crops as he had done for years before the deeds were executed? Most certainly they were, if human testimony is to be believed; and when complainants testify that they would not have extended President Billups credit had they known of the execution of the deeds, they are not testifying to establish their claims against the estate of a decedent—there is no dispute about their debts—but they are testifying against the bank, and to establish their claims against it. No question as to the competency of complainants as witnesses was made in the court below. But to

return to the application of the equitable principles mentioned. If appellants were so misled, it is no answer to them for the bank to say, "We intended no wrong." The bank is conclusively taken to have intended the natural and logical results of its acts.

Did not the bank maintain silence when in equity it ought to have spoken or acted? Ought it not to have refused to accommodate President Billups by acceding to his request to withhold the deeds from record, when it knew, and was bound to have known, that such withholding, coupled with his continuance to all appearances to be the owner, just as he was before the deeds were made, of the plantation and all the personalty thereon, to say nothing of his continuance in the presidency of the bank, was well calculated to and would perpetuate the public estimate in which he was held by the community as a thoroughly solvent man, and that he was thereby enabled to contract debts, while in truth he was insolvent?

Of course the bank had the abstract right to withhold the deeds from record, but when it intentionally did so, coupled with the other facts of this case, it cannot afterwards insist upon the deeds as valid instruments as against the deceived creditors of the grantor. The bank had the right to accommodate President Billups, but in permitting him to enjoy the benefits of the accommodation it assumed the burdens.

Did not the bank by its course of conduct induce appellants to believe in the existence of a certain state of facts—the ownership of all the property by President Billups—and act on that belief, so as to alter their previous condition, by loaning money to him and selling him merchandise? Most surely it did. Is not the bank now precluded from averring a different state of facts as existing at the time? Equity, justice, and common honesty, we think, demand that it should be.

It must be remembered all the time in the consideration of this case that appellants do not count alone on the registry statute (Code 1892, § 2457) as rendering void the conveyances to the bank; they count as well upon the statute of frauds (Code

1892, § 4226) and the great common-law principle of which
that statute is declaratory as condemning said deeds; and too
much emphasis cannot be placed on the conduct of the bank, not
alone in withholding the, deeds from record, but in permitting
President Billups to appear to the world, in connection with the
affirmative declination to record the instruments, as the real
owner of all the property, the plantation and personalty thereon,
and the magnificent home in which he resided, not to mention
the financial character certificate which was given him by his
continuance as president of the bank.    These things combined
certainly make out a case of fraud.    The intentional withhold-
ing of the deeds from record is but the keystone to the arch of
an old-fashioned actual fraud.

*J. A. P. Campbell, E. T. Sykes, Thos. J. O'Neill,* and *Alex-
ander & Alexander,* for appellee.

The bank did nothing to mislead anybody, nothing it did not
have the right in law and morals to do.    It had a large claim on
its president, and adjusted it by taking a conveyance of prop-
erty in payment of a large part of the debt and other property in
trust as security for the remainder of the debt.    It made no
proclamation to the world of the transaction.    It was not re-
quired to do so.    It did not file for record the conveyances made
to it.    No law required it.    By failing to do this it simply took
the risk the law imposed for such failure—*i e.,* that a *bona fide
purchase* might intervene or that some general creditor might
acquire a lien before the bank should file for record its convey-
ances.    It stands *rectus in curia,* because it violated no law by
commission or omission.    The vociferous cry of fraud will effect
nothing until some specific act of wrongdoing by the bank can be
pointed to.    Not one has been named by counsel for appellants.
Analysis of the charges made will fail to discover a single thing
done or failed to be done by the bank violative of law.    The ad-
dition or multiplication of ciphers produces only ciphers.·    The
true ground of complaint is that the bank did not do; it was

not active, but entirely passive. There was nothing unlawful in its deal with Billups. Surely there was no fraud in that. When and how did the transaction become tainted? Was it from renting the plantation and personalty on it which the bank had bought and paid for? Was it from withholding the conveyances from record? Was it from not causing a change to be made as to the assessment of the land for taxes? Was it because the instruments were withheld from record, at the request of Billups? Was the transaction, which was lawful in its inception, made fraudulent and void by the bank permitting Billups to use the $1,000 annual rental for three years to pay other creditors? Did the palatial home and luxurious style in which Billups lived infect the transaction with fraud? Did the fact that Banks, the vice president of the bank, knew that Billups owed him more than $25,000 constitute fraud? There is no germ of fraud in any of those things, and their combination cannot develop disease. The bank had the right as the owner to lease the plantation and personalty to Billups, and, if it permitted the rents to be used by him to pay others, surely it did no wrong to them. It had the right to withhold the conveyance from record and take the legal risk incident, and that it did this at the request of Billups made no change in the legal status. No matter what led to its action or nonaction, the question is not what caused it, but what was its legal effect. The palatial home and luxurious style in which Billups lived was not an element of fraud, nor was Banks' knowledge that Billups owed him a large sum, or the failure of the bank to have the assessment changed, since assessment rolls are not expositors of title. That the only purpose of the bank was to obtain payment of its debt and security therefor is manifest. That it is a bank, and not a private individual, so far from exciting prejudice, deserves commendation for its action to collect what was due it, in the interest of depositors and stockholders, for whom its officers were trustees and charged with a great responsibility. Billups was a man of the highest character, confided in by everybody and with good credit, and it is very

doubtful if any in the community would have refused him credit, had all known of his deal with the bank. Had the deeds been recorded, it is improbable that the complainants would have had actual knowledge of what the law would have conclusively charged them with knowledge of. For some eight years Billups maintained his credit, and but for death would doubtless have continued to do so. That Billups died and precipitated a state of things that caused loss to the complainants did not convert a legal transaction into a fraudulent one. That an act of omission is hurtful to another does not constitute fraud. The act or failure to act must be one forbidden or required by law. Harm to another and violation of law must concur to constitute fraud. One may loan personalty to another who has possession and control for any period less than three years with no record or public notice of it. The possessor is thus invested with apparent ownership, and may obtain credit on the faith of it, but the real owner may maintain his title against any purchaser or even a creditor who has a lien, because this is the law. One may, retaining title, make a conditional sale of personalty putting the purchaser in possession and yet prevail in assertion of his secret title against any purchaser or confiding creditor who trusted to the apparent ownership. One may hire chattels from year to year indefinitely and not lose the right to them in favor of purchasers or creditors who deal with the hirer on the faith of his ownership from possession, because the three-year statute of frauds as to loans and reservations does not apply to hiring. 26 Miss., 275; 29 Ala., 188.

In like manner a man may withhold from record his absolute or conditional conveyances while the grantor obtains credit, and the only risk run is that the grantor may sell to an innocent purchaser for value or that some creditor of his may acquire a lien on the property. 64 Miss., 47; 69 Miss., 687.

No fraud is predicable of any of these transactions, because they are legal, and because of that a necessary element of fraud is lacking.

Equity follows the law, and in neither is fraud imputable when there is no want of conformity to or transgression of any law. Jumbling together a string of assertions, even if all be true, none of which is a violation of any law, and calling it fraud because somebody was hurt by extending credit, cannot affect the validity of a perfectly legal course of action. You must put your finger on something the party has done which the law forbids or has failed to do which the law requires before you can convict him of fraud, no matter who may have suffered.

In several states of this union a conveyance of land, if lodged for record within one year of its execution, relates back to that date. The delay to record may result in serious harm to purchasers or creditors, but fraud is not predicable of it. If Billups had not made the conveyances until just before his death, or if, having been made as they were and surrendered to him for new ones, he had executed such, or if he had confessed judgment to the bank, the other creditors would have been remediless. How, then, can it be held that the instruments executed in 1894, and brought to light when they were, are any less effective than they would have been in the state of case supposed? In the cases put the "unfairness and hardship" to other creditors would have been just the same, and there would have been no semblance of fraud.

That Billups was president of the bank and a brother and some remote kin by affinity were directors is unimportant. His character as president was quite distinct from his relation as debtor, and the relationship of directors is worthless in the case.

The acknowledgment of the instruments before an "underling" of the bank, who was a duly authorized notary public, and the delivery of them to the proper custodian of the bank, were free from legal objection. To hold these to be badges of fraud would shock the business community and upset the everyday practice of banks and those who deal with them. Urging these things as ground of condemnation of the transaction is catching at straws made necessary because there is nothing more substantial to seize upon.

There is nothing in the alleged non-delivery of the deed of trust or the ignorance of the trustee of its execution. It was delivered to the beneficiary, the usual course in such transactions. No formal acceptance by the trustee is necessary. He need not know of its existence. He may accept the trust at any time. *Omnis ratihibitio,* etc., applies. Jones on Mortgages, sec. 1780; Pingree Mort., sec. 1327.

The delivery of all the deeds to the bank was complete and perfect. They were formally parted with by the grantor, and placed forever beyond his control or right to recall. Strip this case of the sentimentalism in which it it enveloped by the fiery eloquence of counsel, and examine it by the light of legal principles, and there is nothing in the complaint of the action or non-action of the bank.

Examination of the numerous cases cited for appellants will show either a widely different state of facts in each from that presented by this or a different statute from ours or a different view of the law from that established in this state.

It will not do to try this case by the rules applicable to preferential assignments, which are governed by rules peculiar to them.

It will not be safe to be guided by the opinion in *Hilliard* v. *Cagle,* 46 Miss., 309, which, besides the criticism of this court in 64 Miss., 67, and 69 *Ib.,* 687, has received the condemnation of the supreme court of Alabama in this language—viz.: "The case of *Hilliard* v. *Cagle,* 46 Miss., 309, seems to go to the extent of creating an estoppel in favor of creditors generally without any actual fraud being imputed to the mortgagee in withholding his mortgage from registration. This view is contrary to the spirit of our registration statute, and does not seem to us to be based on sound reasoning. It affords protection to those not intended to be protected by the statute—to other than subsequent purchasers for value, mortgagees, and judgment creditors." 87 Ala., p. 745. This case cites with approval the case in 105 U. S., 100, because of the gross fraud committed by the mortgagee,

who, with an unrecorded mortgage, made false representations to the effect that the mortgagor had large property unincum-. bered and good credit, on the faith of which false representations he obtained large advances. Of course on this ground the case in 105 U. S., 100, was rightly decided, not because of the withholding of the mortgage from record, but because of the actual fraud committed by false representations. There was a proper application of the equitable doctrine of estoppel, but it has no place, in the absence of actual fraud, in considering the effect of non-degistration. We confess inability to understand the talk about *active* concealment. We do not know what that is. Failure to record is not active, but passive. It is not doing, but failing to do, and how nonaction can be characterized as *active* is in- comprehensible by us. It is a catching phrase intended to give some effect not warranted to the mere fact of non-registration. The passiveness of the mortgagee in not recording made his activity in falsely representing the financial condition of the mortgagor, a fraud whereby the party acting on the false repre- sentations was induced to extend large credit. The opinion in that case is very much labored, and might well have been very much shorter, and thereby better. It cites and approves *Hil- liard* v. *Cagle,* 46 Miss., 309, the writer, no doubt captivated by the fine phrases inappropriately used in the opinion in that case —sound maxims, but having no place in the discussion. in that case.

If the law condemns a transaction, there is no need for the doctrine of estoppel; and if the law allows what is done, estop- pel is not predicable of it. Equitable estoppel belongs to a very different class of cases, and performs its beneficent work in other cases than the operation of the registration laws. Search Her- man and Bigelow on Estoppel, and this will be confirmed.

*Hilliard* v. *Cagle* was decided mainly on the case in 2 Mary- land Ch., and it was decided on a statute which made a mort- gage of personalty, which was the subject of the mortgage, void, if not recorded—a very different case from ours. Wait on

Fraud. Con., quoting from the opinion in 105 U. S., 100, adds: "But there must be some evidence of a preconcerted and contrived purpose to deceive and defraud the other creditors of the mortgagor, of which scheme the withholding of the instrument from the record constitutes a part." P. 332, sec. 235, 2d ed. of Wait.

Nearly one hundred years ago it was settled in Virginia, whence we derived our registration laws, that the creditors meant to be protected by this statute are *lien* creditors. And more than half a century ago it was so announced in this state, and has been maintained ever since. 2 Tucker's Com., 379; 6 Rand., 185; 3 Hen. & Musr., 352; 9 Wheat., 485. See 2 Bibb., 420; 4 Dana, 252; 10 Leigh, 499.

The decisions of courts whose statutes are different from ours, or are differently interpreted, or where the common law is differently declared, are only misleading and not helpful to correct solutions of questions under our statutes.

"Mere failure to record a mortgage is not a ground for setting it aside for the benefit of subsequent creditors who have acquired no specific lien on the property described in the mortgage." Herman on Estoppel, 923; Bump. Fraud. Con., 38-40; 87 Ala., 736, p. 742; 77 Ala., 184, 189; and numerous other citations might be made, but it is useless. Even 105 U. S., 100, the quiver which furnished most of the arrows of counsel for complainants, distinctly announces the same doctrine.

Mere delay in the delivery of possession (of chattels) is ordinarily not considered fraudulent as to creditors as long as delivery is actually made before attachment. Until the attachment the debtor has done nothing to the injury of the creditor on which to claim a voidance of the sale." Tiedman Equity, citing 53 Conn., 401, and many other cases. "A deed not fraudulent in its inception could not become so by a matter subsequent. If a deed of trust be fairly executed to secure a just debt, it cannot be impeached for fraud for any matter *ex post facto.*" 6 Randolph (Va.), 306; Bump. Fraud. Con., 157.

Proof of *bona fide* hiring or lease will, as a general rule, repel the presumption of fraud. 55 Ala., 282, 300, citing a number of cases.

Hiring slaves from year to year is not within the three-year statute of frauds. 28 Ala., 188; 26 Miss., 275. Hiring slaves was, from 1840 to 1846.

Possession of land is not even presumptive evidence of ownership or fraud. Bump. on Fraud. Con., 122.

The death of Billups, the grantor and mortgagor, did not prevent the recording of the instruments or change in any way the rights of parties. Jones on Mort., sec. 509, and cases cited.

The creditor has no lien on the estate of the decedent and *a fortiori* no claim on the property conveyed or mortgaged to another. He has a claim on what belonged to the decedent, and which would go to the heir or legatee or devisee, not on what the decedent if alive could not claim. Pingree on Mort., sec. 725; Jones, sec. 509.

No one can read the record of the action of the bank in this transaction and reach any other conclusion than that its sole object was to guard the interests committed to it by securing the large debt due it from Billups, who was its president, and, having faith in him—as everybody had who knew him—indulged him for years, and aided him as far as it could by *passiveness* to work out of debt, if he could, and it is an unjust and cruel charge to make that it was guilty of actual intent to defraud his other creditors. If mere indulgence by a creditor constitutes fraud, the bank was guilty; otherwise not, for it did nothing to induce any person to credit Billups. If its purpose had been to defraud his existing creditors, that would not avail subsequent creditors, which complainants are. Code, § 4228; 46 Miss., 309; 54 Miss., 746; 4 Smed. & M., 309; 60 Miss., 886; 106 U. S., 260, quoting and approving 59 Mo., 159. Can it be believed that the conveyances in 1894 were intended to deceive and defraud creditors in 1902?

Billups, besides being president of the bank, with a salary of

$900, and $500 for managing the plantation of the bank, was engaged in business supposed to be very profitable, and he rented several plantations and made several hundred bales of cotton, and for years paid his debts and maintained his credit; and unless this court is willing to overturn the settled law of this state, it must say the bank did nothing it had not the right to do, and affirm the decree.

The court will find 55 Ala., 282—292, a most valuable case elucidating every principle applicable to this; also 50 Ala., 590, and 40 Ala., 259—269, will be found helpful.

Argued orally by *Marcellus Green, J. I. Sturdivant, R. H. Thompson,* and *J. A. Orr,* for appellants; and by *C. H. Alexander, J. A. P. Campbell,* and *E. T. Sykes,* for the appellee.

CALHOON, J., delivered the opinion of the court.

These three cases, though differing in some respects as to the pleadings, all rest substantially on identical facts, and since the result in each case must turn upon a pure question of fact, and that the same question of fact, one opinion will apply to all. There is no dispute in reality between the parties as to the law governing the cases. It is, of course, clear that a mere withholding of the instruments in this case from record, unattended by any other circumstances, would not be a fraud. Instruments may be withheld from record as the result of mere inattention, indifference, or mere agreement to withhold, without fraudulent purpose. In such case the only penalty the law visits upon the party so withholding is the risk that some other lien creditor may record his lien in the meanwhile, and so obtain priority over the instruments withheld from record. But if the evidence goes beyond this, and clearly and convincingly, as it must always do in cases of actual fraud, shows that the withholding from record was the result of an agreement so to do between the grantor and grantee, and, further, that the instruments were to be so withheld with the intent on the part of the grantor and

grantee that knowledge of such instruments should be withheld from the public, so as to give the grantor a fictitious credit, enabling him to obtain credit from others trusting him on the faith of his supposed ownership of the property conveyed in the instruments, then such facts make a case of actual fraud. In the Klein case, 64 Miss., 41 (8 South., 204), the court found that Mrs. Klein simply trusted, as a wife and mother usually does, to her husband and her son, and had no knowledge of the facts connected with the business in any way; that she did not know that a conveyance in that case ought to be recorded, and was wholly in ignorance of any agreement that it should not be recorded. In the case of *Day* v. *Goodbar,* 69 Miss., 687 (12 South., 30), it appeared that one of the members of a mercantile firm executed a mortgage, not on firm property, but on about one-third only of the individual property of one member of the firm, and the proof failed to show sufficiently that there was any agreement to withhold the instruments from record. So far as these two cases are concerned, therefore, it is obvious that there was no actual fraud. The case of *Hilliard* v. *Cagle,* 46 Miss., 309, is also manifestly a case based on actual fraud, although an unfortunate expression in the first part of the opinion would seem to indicate that the court thought it was a case of constructive, and not actual, fraud. The facts of the case, however, plainly show actual fraud, as pointed out in *Klein* v. *Richardson* and *Day* v. *Goodbar, supra.*

What are the facts of this particular case? J. M. Billups, on November 5, 1894, was president of the Columbus Insurance and Banking Company, and had been for thirty years theretofore, and he remained president to the date of his death, August 11, 1902. On November 5, 1894, he executed a deed and bill of sale and a trust deed to said bank, which conveyed all his known visible property, to secure an indebtedness due said bank of some $30,000. It is perfectly clear that he was insolvent at the time, and that this insolvency was well known to the bank. All these instruments were acknowledged before C. H. Ayres, who was a

notary public, and also the teller of the bank. The trustee in
the deed of trust was a director in the bank, and a majority of
the directors were related to Billups either by consanguinity or
affinity. It is impossible to escape the conclusion from the testi-
mony that there was an agreement between the bank and Billups
that these instruments should be withheld from record. Semi-
annually, for eight years, the question of whether the deed and
deed of trust should be recorded was discussed by the directors,
and on each occasion the conclusion was still to keep them from
record. They were so continuously withheld from record from
the date of execution until 50 minutes after 4 o'clock P.M. on
August 11, 1902, when they were filed for record, such filing
occurring only a few minutes after the death of Billups, the
chancery clerk having had the papers handed to him by a brother
of Billups a few days before Billups' death, with instructions
not to file them for record until after his death. At the time
(November 5, 1894) of the execution of these instruments J.
M. Billups was individually indebted to the appellee bank in
the sum of $27,000, and after the execution of these in-
struments in part payment of said indebtedness, he still owed
the appellee about $16,000, which was that day evidenced by
two notes—one for $10,712.51, secured by sixty shares of bank
stock, of the par value of $6,000, and a paid-up policy of life
insurance for $5,070, payable and absolutely assigned to the
appellee, and one note for $5,000, secured by a deed of trust
on Billups' homestead, in Columbus, Miss. As additional
security for these two notes, it was agreed that Billups' salary
as president and the dividends on said sixty shares of bank
stock should be applied on December 31st of each and every
year to the payment of the two notes, and they were so applied.
On that same day—November 5, 1894—as a part of the same
transaction, a statement of the indebtedness of Billups & Banks,
cotton commission merchants, composed of Billups and Col.
Banks, was made to the appellee by the cashier of the appellee
bank. This statement showed that the firm of Billups & Banks

acquired a credit of some $34,000, which was that day secured to the bank by two notes, of some $17,000 each, payable in one and two years from date, the notes being executed by Billups and Banks as individuals, and not as a firm. After the payment of said firm indebtedness on November 5, 1894, by Billups, of some $7,000, he was then indebted to Billups & Banks in the sum of about $9,000. So that, to summarize, on November 5, 1894, Maj. Billups stripped himself of all his property by these instruments, and owed the following amounts, approximately: $16,000 on his individual account to the bank; $34,000 on the indebtedness of Billups & Banks to the bank; $9,000 to Billups & Banks, Billups having assigned as security for this an insurance policy for $5,000. This statement, fully proved by the evidence, makes out a total indebtedness on November 5, 1894, on the part of Billups, of about $59,000, or, if it be said that he owed only half of the firm debt of Billups & Banks, of about $42,000. Billups was insolvent on said date, and remained so until the day of his death, and Banks paid the bank the whole of the indebtedness due by Billups & Banks. These instruments were kept in the vault of the bank for the entire eight years, but were put promptly to record within a few minutes after Billups' death, having been sent to the clerk some forty-eight hours before his death, with instructions not to record until after his death. It is clear that an agreement was made between Billups and the directory of the bank so to withhold these instruments from record; the directory, according to some of the witnesses, doing so reluctantly, at Billups' earnest insistence. It further appears that, from the time of the execution of these instruments until the death of Billups, all the property conveyed to the bank remained assessed to Billups for state and county taxes, and that these taxes were actually paid by Billups as an individual, although it also appears that the bank reimbursed him for the taxes so paid. It further appears, from the deposition of Armstrong, tax collector, that Billups paid the taxes on the plantation and personal property and his dwelling

house (all this property being embraced in one receipt) by his individual check, and the taxes on the other real estate owned by the bank and managed by Billups by giving his check as president of the bank, the tax receipts for 1900 and 1901 showing that the payments of taxes on the other lands of the bank and on this land were made several days apart. It further appears that all of the personal property on the plantation, consumable in its use, of the value of about $2,200, was dealt with by Billups as if it were his own, in all respects—a large part of it being used up—and that Billups retained possession of all said lands conveyed by him to the said bank, controlling and exercising dominion over them, from the time of the execution of the instruments to the day of his death, just as if he were owner. It does appear, however, further, that there was a renting of some kind by the bank to Billups for the year 1902, for $900.80, of the plantation. This $900.80 would seem to be the exact amount, to a cent, which 8 per cent per annum on the purchase price of the plantation, $9,060, added to the purchase price of the personal property, $2,200 ($11,260 in all), would make. The personal property consisted of twenty-two mules, five wagons, one gin, one press, one mower and rake, one yoke of oxen, ten cows and calves, forty head of hogs, twelve double plows, twenty-two sets of plow gear, twenty-eight sweeps, and fifteen single plows. But Billups was allowed to control all said personalty as if it were his own. At his death there were only three or four mules found on the plantation. This rent of $900.80 for the land remained the same from 1895 to Billups' death, no effort being made by the bank to rent to any other party. But the year after his death the same plantation, without the $2,200 of personal property, was rented for $1,100. The control and possession of all this property—farm and personalty—was open to the inspection of every one; and it is abundantly shown by the testimony that all persons in the neighborhood of the farm, including one Hines, who had been for seven years manager of the home plantation, supposed all the

time that Billups owned the plantation, and never knew anything to the contrary until after his death. It further appears that Billups gave Walker a note for $638, securing it by note reciting twenty-three bales of cotton "made on my plantation in the Trinity neighborhood," and one to Wood for $500, reciting that it was secured by seventeen bales of cotton grown on "my home place." This property had been conveyed before these notes were made. The evidence makes it too clear for disputation that Billups was believed by all the public to be, after the execution of these instruments to the bank, just as completely owner of the property conveyed by him to the bank as he had been before their execution. And it further appears satisfactorily that the creditors in these three suits extended credit to Billups upon the faith of his ownership of this property, and that, if they had known that he was not the owner, no credit would have been extended. We think the clear result of the testimony is, further, that the bank knew, and was bound to have known, that Billups was contracting debts all the while after the execution of these instruments until his death. It appears, for example, that in 1898 and 1899 the notes he gave the bank were secured by collateral, and that this collateral was so many bales of cotton to be raised, but that, as he did not make enough to satisfy outside parties who had claims on the crop, the bank waived its claim on that cotton and held those notes without any security whatever. It also appears that large checks were sometimes drawn on the bank by Billups, the cashier, however, stating that he only remembered the parties to whom payable in one or two instances—especially mentioning two checks to Robertson & Co. in January, 1902. Col. Banks, vice president and director of the bank, testified that a major part of the planters in that section did business on a credit, and that he did not know whether the bank knew that Billups was farming on credit, but supposed it did. During all these eight years, from November 5, 1894, Billups, until his death, engaged in large farming operations, renting his home place from the bank and other

land from three or four parties near this place. He was the senior member of the old firm of Billups & Banks, commission merchants, from 1892 until January 16, 1900. Billups was about seventy years of age when he executed these instruments.

It is hard to understand why, if there was no agreement not to record the instruments, as is stoutly urged, the bank should have been so thoroughly dominated by Billups while he lived and should put them so instantly to record upon his death. The existence of these instruments was kept from the knowledge of all persons except the parties thereto, and perhaps one or two members of Billups' family. It is also impossible to understand how, if, as contended by the bank, it did not know that Billups was contracting any other debts, it should have been so anxious to record the instruments as soon as he was dead. If it was unnecessary to record them during his life, when he might have contracted future debts, if the bank was satisfied that he owed none, then why, after he was dead and could not possibly contract any more debts, should the bank rush the papers to record? It is asked very earnestly, What advantage was there to accrue to the bank from withholding these instruments from record? It seems to us the answer is plain and perfect. If the public had known the true situation on the 5th of November, 1894— that this bank had as its president a man who had at the close of that day stripped himself of every particle of property, and who was hopelessly insolvent, and who still owed the large sums we have referred to, to the bank, after all credits had been applied, and that the bank had allowed this president in the past to so largely overdraw, and proposed for the future to keep secret the true situation as to his ownership of the property he had theretofore owned—is it not perfectly obvious that confidence in the bank itself would have been seriously shaken, if not destroyed, and its own credit thereby impaired or taken away? Surely no elaboration is needed to make this plain. It might very well be that the bank wished no breach with its president, no resort to courts for the collection of its debts, no

disclosure to the public of the methods of dealing between it and its president or of the fact that the president and vice president owed the bank nearly $70,000, since such knowledge might well have tended to shake the confidence of the public in the safety and saneness of the bank's management. Such considerations would be very material in inducing the action of the bank in concealing these instruments from the knowledge of the public.

We have given this case the most careful, painstaking, and protracted examination, and we are constrained by the inexorable facts of the case to hold that the case here made, as above set out, is one of actual fraud. If actual fraud could only be made out by declaration of the parties to a scheme which the law condemns, there would be few cases indeed in which the arm of the law could reach and uncover it, letting in the light of day; for all such schemes are, from their very nature, surrounded with secrecy, and the actors therein ought not to be expected to proclaim themselves amenable to the law's condemnation. Courts must always look to the dealings and conduct of the parties, rather than to any declaration they may make, as to the fraud, or not, of the transaction assailed. The view which we have taken is abundantly supported by authority. It is supported by *Hilliard* v. *Cagle,* 46 Miss., 309, cited with approval in *Blennerhassett* v. *Sherman,* 105 U. S., 100 (26 L. ed., 1080); by the Sherman-Blennerhassett case itself, and numerous authorities therein reviewed; by *Mobile Sav. Bank* v. *McDonnell,* 87 Ala., 736 (6 South. Rep., 703); by *Lehman, Durr & Co.* v. *Van Winkle* (Ala.), 8 South. Rep., 870; by *Central Nat. Bank* v. *Doran,* 109 Mo., 40 (18 S. W., 836); by *Walton* v. *First State Bank* (Colo. Sup.), 22 Pac., 440 (5 L. R. A., 765; 16 Am. St. Rep., 200); by *Clayton* v. *Exchange Bank,* 121 Fed. Rep., 630 (57 C. C. A., 656); and by the authorities cited at p. 113, vol. 24, Am. & Eng. Ency. Law (2d ed.), which have been accurately analyzed by learned counsel for the appellant (*Rice* v. *Wood,* 31 L. R. A., 638, note N).

We do not think the doctrine has anywhere been more accurately expressed than by that great judge, Chief Justice McClellan, in *Lehman, Durr & Co.* v. *Van Winkle,* decided in 1891, *supra;* and we approve that statement of the doctrine, which is as follows: "Had there been no understanding looking to the concealment of the mortgage by keeping it from the records—no purpose so to do, to the end of bolstering up Belzer & Parker's credit—but only an unintentional omission to record it, of course the only effect of not recording it would be to postpone it to after-acquired liens. But as here alleged, the failure to record it is not mere omission, attributable to inadvertence, inconvenience, or negligence, but is an affirmative and intentional withholding from record, with the ulterior purpose charged in the bill, and we cannot be in doubt that the transaction is tainted with actual fraud, which will vitiate it as against subsequent creditors and the like, who have been drawn into contractual relations with the mortgagors by assuming their apparent to be their real status with respect to the property covered by the mortgage; and this result follows notwithstanding the conveyance is free from infirmity in every other respect. *Blennerhassett* v. *Sherman,* 105 U. S., 100 (25 L. ed., 1080), and numerous cases there cited and quoted; *Bank* v. *McDonnell,* 87 Ala., 736 (6 South. Rep., 703)." In all these cases of actual fraud, the principle on which the party holding the mortgage or deed of conveyance is postponed, and the defrauded creditors let in, to be first paid out of the avails of the property mortgaged or conveyed, is, as well said in the citation from the Am. & Eng. Ency. Law, *supra,* that such defrauded creditors are not required to have secured a lien before such instruments have been actually recorded, but that their claim for relief is based on fraud, and not on the protection of the recording acts; and it will be specially noted in the case at bar that we are dealing, so far as the plantation is concerned, with the case of an absolute deed, where the vendor was left in possession, contrary to the essential nature and terms of the conveyance, and not with

a mortgage, where continued possession by the mortgagor for a reasonable length of time would be consistent with the nature of the security, as pointed out in *Mobile Sav. Bank* v. *McDonnell, supra.*

*It follows from these views that the decree in each of these cases is reversed, and the cause remanded to be proceeded with in accordance with this opinion; the complainants being entitled to have their claims first paid out of the property, except legal homestead, conveyed by said Billups to the bank.*